(No. 67451.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY ENIS, Appellant.

*Opinion filed November 30, 1990.*

266

Charles M. Schiedel, Deputy Defender, of Springfield, and James E. Chadd, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Anthony Enis, was charged by indictment in the circuit court of Lake County with one count of intentional murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and three counts of knowing murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)). A jury trial followed and the jury returned a general verdict finding defendant guilty of first degree murder. A death sentence hearing was held and the jury found present the aggravating factor in section 9—1(b)(8) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(8) (committed murder to prevent murdered individual from testifying against defendant in criminal prosecution)), and that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death and the sentence was stayed (107 Ill. 2d R.

609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The victim in this case, Melinda Entrata, was a complainant in a criminal sexual assault case against defendant. The sexual assault case was scheduled for trial on August 17, 1987. However, Entrata was found dead in the hallway of her apartment building on the morning of August 10, 1987. She had been shot in the head four times. At defendant's trial for Entrata's murder, the State attempted to establish that defendant had the motive to murder her and that he had been identified as the gunman beyond a reasonable doubt. In his defense, defendant claimed that he was the victim of mistaken identification. He also claimed that he did not rape Entrata and that the sexual assault case was not strong. Therefore, he did not have the motive to murder Entrata.

## Facts

The State presented extensive evidence during the trial, including the testimony of seven persons who were near the scene of the murder. John Twardy lived in the same apartment complex as Entrata but in a different building, although it was nearby and on the same street as her building. On August 10, 1987, at 6:45 a.m., Twardy was looking out his bedroom window when he saw a man running. The man jumped over a hedge, dropped something, stopped to pick it up, and then continued running. At that point he lost track of the man. A few seconds later he saw a maroon car with a front hubcap missing pull out of the parking lot. The following day police officers took Twardy to defendant's residence and showed him a maroon car that belonged to the woman with whom defendant lived. Twardy stated the car looked the same as the one he had seen and it was

missing the same hubcap, but it appeared to be "shinier" than the one that pulled out of the parking lot.

Joseph O'Neal also lived on the same street as Entrata, and he testified that at 6:45 a.m. he too saw a man jogging while carrying what appeared to be a lunch box. The man jumped over some bushes, dropped the lunch box, stopped to pick it up and then continued jogging. He could not recall giving an officer a physical description of the man or saying that he saw him enter a red-colored vehicle, although an officer testified that O'Neal did provide such information.

David Dudzinski testified that at 6:50 a.m. on August 10, 1987, he was backing out of his parking spot near Entrata's building when a car sped past him. On August 17, the police showed him the car belonging to defendant's girlfriend, and he stated that it was similar in size and color to the one he had seen earlier. At trial, he was shown a photo of the car but testified he was not positive that it was the same car as the one he had seen on August 10.

Sylvia Barrett testified that at 6:40 a.m. on August 10, she was a passenger in a van driving near Entrata's apartment building. Barrett saw a man sitting on the pavement in front of the bumper of a parked car. The man was watching people leaving the building in which Entrata lived. The man was wearing a dark-blue mechanic's suit or jump suit and had on sunglasses. Barrett watched the man for about three to five minutes and stated that she was able to see the left, right and front of the man's face. In court, she identified defendant as the man she was watching on August 10, 1987. She further testified that on August 12, 1987, she picked the defendant's photograph out of a number of photographs that officers showed her. Also, Barrett was shown on February 16, 1988, a photograph of a live lineup and she again identified the defendant as the man she had seen

at the apartment building. On cross-examination, Barrett said she did not notice whether the man was wearing white gloves or holding a metal box.

Clara Burk's testimony placed the defendant near Entrata's building on two separate occasions. Burk testified that on August 8, at 9:30 p.m., she was driving through the building's parking lot when a man stepped in front of her car. She stopped her car and the man walked past. She described the person as a black male between 5 feet 8 inches and 5 feet 9 inches who was wearing white sunglasses. In court, she identified the defendant as that person. Burk further testified that on the morning of August 10, she was driving in the same area and saw a man sitting in a half crouch between a car and a van. The man was wearing sunglasses and was carrying what appeared to be a lunch box. She identified the defendant as that man. Burk then testified that on that morning, she noticed a woman in a white uniform exiting an apartment building. When the woman saw the man, she ran back into the building and the man followed her. As Burk continued on she heard three gunshots. On August 11, 1987, police officers showed Burk a single photo of the defendant and she identified the person as the man she had seen in the parking lot. On cross-examination, she stated that she was unsure if the man wore sunglasses on August 10.

Dan Thacker testified that at approximately 6:30 a.m., August 10, 1987, he saw, from his apartment window, a woman in a white dress run across the parking lot toward the building. He then saw a man follow her. The man was in his early 20s, black, about 5 feet 10 inches or 5 feet 11 inches, and slender, had short hair, and was wearing dark clothes, white sunglasses, and white gloves, and carrying a lunch box. Later, he saw the man exit the building. The police showed Thacker a number of photos and he picked out the defendant's

photo, stating that the person had the same "general features" as the man he had seen but he was not certain that it was the same person. On August 11, 1987, Thacker viewed a live lineup. He again picked out the defendant as the person he had seen, but he was not 100% positive of the identification.

The last eyewitness for the State was Richard Hanson, who testified that on August 10, at approximately 6:40 a.m., he was waiting for his car pool to pick him up when he saw a man running. The man was black and about 6 feet tall, had a medium build and short hair, and was wearing dark clothing, white gloves and white sunglasses. Hanson testified that the man jumped over a row of hedges and dropped a silver metal box he was carrying. Hanson saw a small gun fall from the box. The man stopped, put the gun in the box and continued running. Hanson's car pool arrived and he left. At trial, he identified the defendant as the man he saw running. On August 11, 1987, the police showed Hanson a photo of defendant and he identified the person in the photo as the man he had seen running. Later that day, he viewed a live lineup and again identified the defendant. On cross-examination, he stated that he could not be absolutely certain of his identification because the man was wearing sunglasses.

The State also presented the testimony of numerous police officers involved in the murder investigation. At 8 a.m., August 10, 1987, four officers went to defendant's apartment; however, he was not there. Officer Rockingham and his partner went to the rear of the house and saw defendant's girlfriend's parked car, a maroon Oldsmobile. The hood of the car was warm as if it had just been used, the windows were down and there was no dew on the car, although a nearby car had dew on it. Later, Officer Davis checked the car and determined

that it was warm, as if it had been recently used, and that at least four other cars nearby had dew on them.

The State also presented testimony from a former assistant State's Attorney, who testified that Entrata had been the complainant in a criminal sexual assault case which he had handled and that the defendant in that case was Anthony Enis. The case was scheduled for trial on August 17, 1987, but the charges were dropped after Entrata was murdered.

The defense presented the following evidence. The first witness was Michael Melius, former chief public defender of Lake County, who had represented defendant in the sexual assault case. He testified that he had explained to defendant the possible sentences he could receive if found guilty and that defendant had a good case. Melius stated that there had been a preliminary hearing on the sexual assault case and that Officer Moore testified as to statements Entrata had made to him. After the preliminary hearing, the trial judge found there was probable cause to pursue the charges. Also, the judge apparently indicated that if it had been a trial, he would have found defendant not guilty, although he noted that he had been unable to judge the credibility of Entrata since she did not testify. Defendant's bond was then reduced from a $100,000 cash bond to a $20,000 recognizance bond. On cross-examination, Melius testified that he believed he told defendant that the outcome of his case would depend largely on the credibility of Entrata. He also testified that he provided defendant with the discovery from the case and that they reviewed it.

On redirect and recross examinations, Melius testified about numerous statements Entrata made, which were contained in the police reports that were part of the discovery in the sexual assault case. Upon questioning from the defense counsel, Melius pointed out inconsistencies in the statements regarding where the assault occurred,

whether or not the assailant had gloves, what type of sexual activity they engaged in and whether the two had a conversation after the encounter. He also testified that the statements indicated that Entrata told a friend, Moselle Williams, what had occurred and he told her to call the police immediately but that she did not call the police for a number of days. Upon questioning from the State, Melius stated that the statements indicated that the offender wore a mask and gloves, that he forced Entrata into a car, sexually assaulted her and that he threatened to kill her. Melius testified that according to the statements, Entrata recognized the offender as defendant, that she and defendant worked at the same place, and that he had sent her letters which she had thrown out.

Defendant testified on his own behalf. He stated that he knew Entrata from work and that they had seen each other socially about five times over a two-month period. He said they had a close relationship and he had written her poetry, but that Entrata ended the relationship because she was several years older than he and felt uncomfortable with the age difference. The last time they had gone out was April 28, 1987. Defendant met Entrata some time before midnight and they went for a drive. After a while, they pulled the car over to the side of the road and had sexual intercourse, after which Entrata apparently became upset. However, she later calmed down and defendant drove her home. Eight days later he was arrested for sexual assault.

Defendant testified that on August 10, 1987, he awoke at 7 a.m. and his girlfriend was upset because she could not find a bracelet. In order to calm her down, the two took a motorcycle ride and stopped for breakfast. At 10 a.m., when he returned home, the police took him into custody. On cross-examination, defendant stated that he had worked at a Jiffy Lube and had worn a dark-blue mechanic's uniform, that he owned a pair of

white sunglasses and that he had been convicted of theft from a person. Defendant was then asked numerous questions relating to the statements Entrata and Moselle Williams gave to the police. He stated he did not know why they would make such statements. In his appeal, defendant contends that this line of questioning was improper and we will address the propriety of these questions later in the opinion.

Defendant also presented testimony which allegedly contests the validity of the eyewitness identification. Annette Glover testified that on August 10, 1987, she saw a black man in his 20s with short hair and wearing dark clothing, white sunglasses and white gloves sitting in the apartment building's parking lot. Later that morning, the police showed her some photographs, but Glover could not make an identification. The following day she viewed a live lineup, but was again unable to make a positive identification. On cross-examination, she stated that the man had put his hands up to each side of his face, but when she drove past him she could see the front of his face.

Officer Marquez testified that on August 10, he had shown five photographs, one of which was of the defendant, to Dan Thacker, who had testified for the State, but that Thacker could not make an identification.

Officer Tessman testified that at 6:40 a.m. on August 11, 1987, he spoke with Burk. He stated that she was in a hurry and that when he showed her a photograph of defendant, she stated that she had seen him earlier in the week. She did not mention at that time that she had seen a woman chased into a building or had heard gunshots. She did state that she would talk to him again later, and on August 14, she met with the police. On cross-examination, Officer Tessman stated that the conversation on the 11th was brief and that Burk had to go to work. Joseph Caliendo, an investigator with the Lake

County public defender's office, testified that he went to talk with Burk on January 7, 1988, but that she did not want to discuss the case because she was "for the prosecution and against you guys."

Officer Stevenson testified that he interviewed defendant's landlord, R.C. Burton, who told Stevenson that at 6:30 a.m. on August 10, 1987, a maroon car was parked behind defendant's apartment. The maroon car belonged to defendant's girlfriend-roommate, Diane Gonzalez. Steven Jones, a police department evidence technician, processed the maroon car and did not find defendant's fingerprints or any bloodstains.

David R. Kimes, a forensic scientist, examined certain of defendant's clothing. He was unable to match any bloodstains to that of the victim. Kimes also did not detect on the clothing any gunpowder. However, on cross-examination, he stated that he did not necessarily expect there to be gunpowder residue on the clothing of a person who had shot a gun, and that variables such as the size of the gun and whether the shooter had worn gloves were important. Kimes also did not detect on the clothing any carpet fibers from the maroon car, although he was unable to conclude that the person who owned the clothing was never in the car.

After the defendant rested, the State presented evidence in rebuttal. Through the testimony of Officer Stevenson, the State admitted into evidence copies of the police reports concerning the criminal sexual assault case, although the defense objected that the reports were improper rebuttal evidence. Officer Stevenson testified that he found the reports in defendant's apartment. The court concluded that they rebutted defendant's claim that he had no motive to murder Entrata and instructed the jury to consider the records only in connection with establishing motive, not guilt or innocence.

The State presented the testimony of Teresa Coleman, who lived in the apartment next door to defendant. She stated that on August 10, 1987, at approximately 6:30 a.m., she heard noises in defendant's apartment. Also, she did not hear anyone leave before she left for work at 6:35 a.m.

Officer Schriner testified that the distance between defendant's apartment and Entrata's is approximately five to six miles and that it takes approximately 11 minutes to drive it. Last, Officer Marquez testified that he interviewed Annette Glover on August 10, 1987, and she told him that she had seen a man in the parking lot at 6:40 a.m., who was in his 20s and approximately 5 feet 10 inches.

Following deliberation, the jury returned with a general verdict finding defendant guilty of first degree murder.

On appeal, defendant makes two arguments regarding alleged errors that occurred during this innocence-guilt phase of his trial. First, he contends that the trial court ruled improperly on various motions *in limine* and, as a result, he was denied a fair trial and his fifth amendment and fourteenth amendment due process right to present a defense. The second issue concerns the propriety of the prosecutor's cross-examination of the defendant. Although we reverse and remand based on the second issue, we address the first issue because these motions likely will arise again on retrial.

## Motions *In Limine*

Prior to trial, the court granted the State's motion *in limine* to preclude the defense from introducing the testimony of Kathleen Jackson. During arguments on the motion, the defense argued that Jackson's testimony would have shown that someone other than defendant matched the description of the offender and was near

the scene of the crime shortly before Entrata was shot. This testimony would make the fact of mistaken identification more probable than it would have been without the evidence.

The prosecutor stated that Jackson would testify that at between 6:15 a.m. and 6:20 a.m. on August 10, 1987, a black male entered an elevator with her at the Cinnamon Lake Tower apartment building. She told the police the man was about 5 feet 8 inches and was wearing a purple sweater, black pants and white-framed sunglasses. The prosecutor stated that Jackson told him that the man was about 6 feet and very thin, had ear-length hair which was in a "Jheri-Curl," and he was wearing a flowered shirt, a jacket, dark pants and white sunglasses. She would testify that the man left the elevator at the third floor. Jackson was shown photos of the defendant but indicated that he was not the person she had seen. She did identify for the police a photo of Calvin Adams as the person she saw. Adams resided on the third floor of the building. The prosecutor contended that Jackson was later shown a photograph of Adams in Puerto Rico, where she had since moved, and she was not certain that was the man she had seen.

The prosecutor argued that this testimony was significantly different from the other descriptions. First, it was 15 to 20 minutes earlier than the other identifications. Second, the other witnesses saw the person near the Fox Crest apartments, and not the Cinnamon Lake Tower apartments, although the buildings are near each other. Third, the other physical descriptions included testimony that the defendant had a medium build and a short natural hairstyle. Fourth, Jackson did not see any metal box or white gloves. It, therefore, appeared that perhaps the man she had seen was a resident of the Cinnamon Lake Tower building. Moreover, Jackson had

moved to Puerto Rico and the prosecutor argued that it was unnecessary to bring her back for the trial.

An accused may attempt to prove that someone else committed the crime with which he is charged, but that right is not without limitations. (*People v. Ward* (1984), 101 Ill. 2d 443, 455.) "It is, of course, difficult, in dealing with evidence of this character, to define the precise limits which must control its admission." (*People v. Nitti* (1924), 312 Ill. 73, 90.) " 'The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged' (*People v. Peter* (1973), 55 Ill. 2d 443, 459), and whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable; *i.e.*, whether it is relevant." (*Ward*, 101 Ill. 2d at 455.) "A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature." (*Ward*, 101 Ill. 2d at 455; see also *People v. Dukett* (1974), 56 Ill. 2d 432, 448-51.) Although we may have ruled differently if we had been the trial court, the admission of evidence is within the sound discretion of that court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Ward*, 101 Ill. 2d at 455-56.

The similarities between this identified person and defendant are that they are both black males and approximately six feet tall, and each had white sunglasses. However, the person the other witnesses saw was outside a different apartment building and it is likely that the person Jackson saw was merely returning to his apartment. Moreover, the physical build of the person the other witnesses saw was different and no one testified that he had "Jeri-Curl" hair or that it was ear-length. Jackson's testimony also concerned a different time frame and she did not see a metal box or white

gloves; although, the defense may have been able to explain these facts. There is nothing connecting the person Jackson saw with the crime, nor does it necessarily follow that her testimony would have cast doubt over the identification of defendant as the offender. The trial court is granted discretion in the conduct of a trial, and in this instance we cannot find that the exclusion of this proposed testimony was a clear abuse of discretion.

The trial court also granted the State's motions *in limine* to exclude a card sent anonymously to Entrata two weeks prior to her alleged sexual assault. The card contained the hand-printed message, "May all your dreams come true," underneath which was drawn a question mark. Also excluded was the testimony of a handwriting expert who would have testified that the writing on the envelope did not match the defendant's writing. The defendant argues that the evidence supports his claim that someone else was responsible for the murder, contending that because the letter was sent anonymously and contains a mysterious and somewhat ominous message, it tends to show that whoever sent the letter "might have been stalking Entrata from a distance and might have been harassing her."

As stated above, a trial court may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or speculative nature. (*Ward*, 101 Ill. 2d at 455; 4 Callaghan's Illinois Evidence §5.19 (1964 & Supp. 1981).) The proposed evidence was sent to Entrata three months prior to her murder and there is little that could link it to the murder. The card is not necessarily mysterious or ominous and defendant's argument that it indicates a person was stalking or harassing the victim is speculative. Although he correctly argues that if allowed in evidence the State could argue it is not relevant, we cannot conclude that the trial court abused its discretion when it

decided that the evidence was too speculative to have any probative value and therefore precluded defendant from presenting it to the jury.

Defendant next contends that the trial court erred in granting two of the State's motions *in limine* which precluded the defense from introducing evidence that allegedly shows that the conduct of the Waukegan police department may have tainted the State's witnesses and contributed to the mistaken identification of defendant. The first motion precluded introduction of a Chicago police department general order that photographic lineups should be conducted with more than one photograph. At trial, the defense argued that by showing Burk and Hanson only one photograph of defendant, the police possibly tainted future identifications; however, defendant was unable to bolster the argument with evidence of the Chicago police department general order. The trial court ruled the evidence was not relevant and that to allow it in would mean that the State could bring in evidence of numerous other police departments that do not have such a general order. We agree that there is insufficient probative value between the Chicago police department's photographic identification procedure and the alleged mistaken identification of defendant. The ruling did not preclude defendant from arguing that the identifications were faulty. (See *Simmons v. United States* (1968), 390 U.S. 377, 384-86, 19 L. Ed. 2d 1247, 1253-54, 88 S. Ct. 967, 971-72 (in determining propriety of identification, courts must review totality of circumstances in each case); Annot., 39 A.L.R.3d 1000 (1971).) Moreover, defendant does not argue before us that the identifications were tainted or that the testimony of the two witnesses who were shown single photographs should have been excluded. Therefore, we hold that the exclusion of this evidence was not improper.

The second motion precluded the testimony of Cecilia Lynn Hill, who would have testified that in 1984 she gave a defense attorney a statement that she was coerced into giving the Waukegan police a statement implicating her boyfriend in a murder. In arguing the motion, defense counsel contended that if defendant's girlfriend should testify and the State should attempt to impeach her with statements she had given to the Waukegan police, Hill's testimony would be relevant to show the procedures the Waukegan police department uses in murder cases. The trial judge ruled that the testimony had no relevance to the case. We also fail to see the relevance in Hill's testimony to defendant's case. First, it is unclear how this ruling prejudiced defendant. Defendant's girlfriend, Gonzalez, did not testify at the innocence-guilt phase of the trial; thus the State did not attempt to impeach her with the statement she had made to the police. Moreover, Hill's statement relates to a single incident that occurred almost four years prior to Entrata's murder. This is insufficient to establish, or to cast a cloud over, the procedures of an entire police department as they relate to a separate case at a separate time. Therefore, the trial court did not abuse its discretion.

Defendant also argues that the trial court erred in granting the State's motion *in limine* to preclude the defense from presenting evidence that between the time of the filing of the sexual assault charge and the murder Entrata did not complain that defendant harassed or stalked her. Defendant argues that this evidence was relevant to show that he was not attempting to harass Entrata into dropping the rape charges and, thus, supports the defense theory that he did not have a motive to murder her. Again, whatever conclusions can be drawn from this type of evidence are too speculative. First, the State does not claim he stalked or harassed her prior to the murder. Second, the fact there was no complaint may

merely show that she was unaware that she was being stalked. Last, whether or not he was stalking or harassing her is tenuously related to his identification as the person who murdered Entrata. The trial court did not abuse its discretion when it concluded that the fact there was no complaint of harassment on file is not relevant, and it was therefore properly excluded from the trial.

Next, the trial court granted the State's motion *in limine* to preclude the testimony of an expert witness, Dr. Solomon Fulero, who would have testified regarding the reliability of eyewitness testimony. The trial court held that the testimony would amount only to speculation. In an offer of proof, the defense claimed that Dr. Fulero would testify that eyewitness testimony has a powerful impact on jurors, even if it has been discredited on cross-examination. Expert testimony, however, makes jurors more skeptical about eyewitness testimony and it helps the jurors distinguish between accurate and inaccurate identification testimony. His testimony was based on a number of studies and experiments regarding the impact of eyewitness testimony on juries. Dr. Fulero's testimony detailed four areas where jurors hold a number of misconceptions about the identification process. First, jurors believe that the more confident a witness appears to be while testifying, the more likely he or she is to be accurate in the identification. Dr. Fulero contends the relationship between confidence and accuracy is insignificant. Second, jurors believe that the higher the stress level at the time of the identification the more accurate the memory. "Stress" may include the level of fright involved in the situation. According to Dr. Fulero, the higher the stress level the less accurate the memory. Third, jurors believe that when a weapon is present, the identification is usually better. Allegedly, the reverse is true. Last, according to Dr. Fulero jurors give too much weight to time estimates. Dr. Fulero added that there

were other factors that an eyewitness expert could testify about. The prosecutor then cross-examined Dr. Fulero extensively in regard to the reliability of the studies and experiments on which he based his opinion, and the fact that it was difficult to determine how much help this form of testimony provided the jurors.

The State contends that because the trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror, it is not a proper subject for expert testimony, and that this State's appellate court has consistently excluded such testimony. (See *People v. Clark* (1984), 124 Ill. App. 3d 14, 21 (trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror); *People v. Perruquet* (1983), 118 Ill. App. 3d 339, 344 (trial court correctly followed the Illinois rule excluding eyewitness expert testimony); *People v. Brown* (1981), 100 Ill. App. 3d 57, 71-72 ("factors such as stress, opportunity to observe, distortion of memory, and problems of interracial identification, are within the realm of common experience and can be evaluated by the jury without expert assistance"); *People v. Johnson* (1981), 97 Ill. App. 3d 1055, 1069; *People v. Dixon* (1980), 87 Ill. App. 3d 814, 818-19.) This position is in accord with certain other jurisdictions. (See *United States v. Christophe* (9th Cir. 1987), 833 F.2d 1296, 1299-1300; *United States v. Fosher* (1st Cir. 1979), 590 F.2d 381, 382-84; *United States v. Watson* (7th Cir. 1978), 587 F.2d 365, 369; *Smith v. United States* (D.C. App. 1978), 389 A.2d 1356, 1358-59; *Nelson v. State* (Fla. App. 1978), 362 So. 2d 1017, 1021; *State v. Fernald* (Me. 1979), 397 A.2d 194, 197; *State v. Porraro* (R.I. 1979), 404 A.2d 465, 471; see also Loftus & Schneider, *"Behold With Strange Surprise": Judicial Reactions to Expert Testimony Concerning Eyewitness Reliability*, 56 U.M.K.C.L. Rev. 1, 4 n.14 (1987).) However, in the past

decade a number of courts have held that expert testimony concerning eyewitness identification should be admissible in certain circumstances. See, *e.g.*, *Skamarocius v. State* (Alaska App. 1987), 731 P.2d 63, 66-67; *State v. Chapple* (1983), 135 Ariz. 281, 290-97, 660 P.2d 1208, 1217-24; *People v. McDonald* (1984), 37 Cal. 3d 351, 361-77, 690 P.2d 709, 715-27, 208 Cal. Rptr. 236, 242-54; *State v. Moon* (1986), 45 Wash. App. 692, 696-700, 726 P.2d 1263, 1266-68; see also Fassett, *The Third Circuit's Unique Response to Expert Testimony on Eyewitness Perception: Is What You See What You Get?*, 19 Seton Hall L. Rev. 697 (1989) (arguing that eyewitness expert testimony should be admissible); Comment, *Expert Testimony on Eyewitness Identification: The Constitution Says, "Let The Expert Speak"*, 56 Tenn. L. Rev. 735 (1989); see generally Annot., 46 A.L.R.4th 1047 (1986).

In recent years, various circuits of the Federal courts have addressed the admissibility of eyewitness expert testimony. (See Comment, *Misperception in the Circuits: A Survey and Analysis of the Use of Expert Testimony to Reveal the Inherent Unreliability of Eyewitness Identifications*, 15 Ohio N.U.L. Rev. 661 (1988) (reviewing the Federal appellate opinions on the subject).) The district judges in the Federal courts also have broad discretion in determining the reliability of expert testimony and in balancing its probative value against its prejudicial effect. (*United States v. Blade* (8th Cir. 1987), 811 F.2d 461, 465.) Upon review, the courts of appeals have held that there is no Federal authority that *requires* the admission of testimony on the unreliability of eyewitnesses. (*United States v. Langford* (9th Cir. 1986), 802 F.2d 1176, 1179; *United States v. Moore* (5th Cir. 1986), 786 F.2d 1308, 1312-13.) The courts have held that the trial judge did not abuse his discretion in denying the admission of the expert testimony (see, *e.g., Blade*, 811 F.2d at 465; *Langford*, 802 F.2d at 1179-80; *United*

*States v. Serna* (2d Cir. 1986), 799 F.2d 842, 850; *United States v. Poole* (9th Cir. 1986), 794 F.2d 462, 468; *United States v. Moore* (5th Cir. 1986), 786 F.2d 1308, 1312-13; *United States v. Brewer* (9th Cir. 1986), 783 F.2d 841, 843), or that it was harmless error for the trial judge to exclude the testimony (see, *e.g.*, *United States v. Smith* (6th Cir. 1984), 736 F.2d 1103, 1107-08), or that the case should be remanded for a hearing to determine if a fair trial requires the testimony be admitted (see, *e.g.*, *United States v. Sebetich* (3d Cir. 1985), 776 F.2d 412, 419-20; *United States v. Downing* (3d Cir. 1985), 753 F.2d 1224, 1243).

In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208.) In this case, we conclude that expert testimony based on the offers of proof would not have aided the trier of fact in reaching its conclusion. One "misconception" that Dr. Fulero would have testified about is that witnesses in stressful situations have less accurate memories, although jurors believe the opposite. However, in this instance none of the eyewitnesses was in a high stress situation when they viewed the person running or in the parking lot. The witnesses were unaware a crime had occurred or was about to occur, they were generally either in an automobile or in their apartment and there was no apparent threat to them. Dr. Fulero also would have testified that when a weapon is involved the identification is less accurate, even though jurors believe the opposite. Again, only one witness testified that he saw a weapon. Hanson saw a gun fall out of the box when defendant jumped over the hedges. However, Hanson had already been watching the defendant, he was not near the defendant when the gun

fell, he was unaware that the gun was involved in a crime, and he left in his car pool shortly thereafter. We do not believe that in such a circumstance Dr. Fulero's testimony would have made a significant contribution to the trial. Next, he would have testified that jurors give too much weight to time estimates. Again, there is little relevance in this case to testimony regarding time or estimates of how long something took to occur. The other misconception regarded jurors' beliefs that the more confident a witness appears to be while testifying, the more likely he or she is to be accurate in the identification. Although witness confidence may have been present in this case, we do not believe that this factor alone demands that defendant be given a new trial. We thus conclude that there was no abuse of discretion to exclude the eyewitness expert testimony.

We caution against the overuse of expert testimony. Such testimony, in this case concerning the unreliability of eyewitness testimony, could well lead to the use of expert testimony concerning the unreliability of other types of testimony and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-called experts can usually be obtained to support most any position. The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses. We are concerned with the reliability of eyewitness expert testimony (see *United States v. Christophe* (9th Cir. 1987), 833 F.2d 1296, 1299-1300; but see Loftus & Schneider, *"Behold With Strange Surprise": Judicial Reactions to Expert Testimony Concerning Eyewitness Reliability*, 56 U.M.K.C.L. Rev. 1 (1987)), whether and to what degree it can aid the jury, and if it is necessary in light of defendant's ability to cross-examine eyewitnesses. An expert's opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eye-

witness in a particular case may well not fit within the spectrum of these averages. It would be in appropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable.

A trial judge is given broad discretion when determining the admissibility of an expert witness, and when considering the reliability of the expert testimony, the judge should balance its probative value against its prejudicial effect. In the exercise of his discretion, the trial judge should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before him prior to admitting it for the jury's consideration. In this case, we conclude that based on the offer of proof it was proper for the trial judge to exclude the expert testimony.

Last, defendant argues that the improper preclusion of relevant evidence cannot be considered harmless error because it was so damaging to the defense case and the evidence was closely balanced. We have reviewed each ruling and have determined that each was proper or at least not an abuse of discretion. We have not held that the rulings were improper but that the error, if any, was harmless. We therefore find no prejudicial overall impact to defendant's case.

## Cross-Examination of Defendant

The next issue raised is the propriety of the prosecutor's cross-examination of defendant. Defendant testified on direct examination that he had a good relationship with Entrata and that their sexual encounter at the end of April was consensual. During cross-examination, the prosecutor asked defendant a number of questions relating to whether he knew why Entrata told police and a friend she had been sexually assaulted. The State claims the questions were meant to show that defendant was lying about his relationship with Entrata, that he had

raped her and that he had the motive to murder her. Defendant argues that the questions required him to speculate about Entrata's thought process and were asked for the improper purpose of harassing him and to bring out inadmissible details of the criminal sexual assault complaint. This, he claims, denied him his due process right to a fair trial under the fifth and fourteenth amendments.

Early in the cross-examination of defendant, the prosecutor asked if defendant knew what had happened that would cause Entrata to suddenly want to charge him with rape. Defendant replied that he was unable to answer that, apparently because he did not know the answer. He was then asked if he knew why she would tell the police and her friends that she had rebuffed his advances. He stated, "No." Defendant did not object to these questions at trial, nor does he contend in this appeal that they were objectionable.

Later in the cross-examination, however, the prosecutor asked defendant about specific statements Entrata had made to Officer Winston. Defendant was asked if he knew why, if he and Entrata had a close relationship, she would tell the officer that a man wearing a mask, gloves and leather jacket grabbed her in her apartment building parking lot. Defendant said he did not know why she would say that. He was then asked if he knew why she would say the man held her mouth and said he would kill her if she yelled. He repeated his answer. The prosecutor began to ask a question, but the defense counsel objected and a side-bar discussion was held. Defense counsel argued that the State could not bring in facts about the rape through this type of questioning, but, instead, Officers Winston and Moore should be called to testify. The prosecutor argued that he was impeaching defendant's credibility and laying a foundation to rebut his statements that there was a close relation-

ship between the two. The judge said he would allow a few more questions and defense counsel said that they would be allowed in "over objection."

When the cross-examination resumed, the prosecutor asked if defendant knew why Entrata would tell Officer Winston that the man pushed her to her car and grabbed her keys after she threw them under the car. He testified he did not know why she would say that. The State began another question but the judge sustained an objection that it called for speculation. Defendant was then asked if he knew why she would say that after the sexual assault the offender told her repeatedly he would kill her if she told anyone. Defendant repeated his answer. As the prosecutor began to ask a question, defense counsel objected and asked whether Officer Winston was going to testify. A side-bar conference was then held. Defense counsel argued that the officer should have been called earlier to lay foundation for the questions and that defendant has a confrontation right to cross-examine the officer. The defense also argued that the questions were assuming facts not in evidence. The prosecutor argued that he could not lay foundation to rebut defendant's testimony during the State's case in chief and that Officer Winston would be called. The objections were overruled.

The prosecutor then asked defendant why Entrata would make certain statements about the sexual assault to a friend, Moselle Williams. Defendant was first asked if he knew why, if he had a consensual sexual encounter with her, within 24 hours of the act would Entrata tell her friend she had been raped. He said he did not know the answer to that. Defendant was then asked if he knew why, if he had a consensual encounter, Entrata would tell her friend that as she returned home from work at night a man wearing a mask and gloves ran up to her. He said he did not know why she would say that.

As the prosecutor began to ask another question, defense counsel again requested a side-bar discussion. The defense argued that the questions assumed facts not in evidence, that the friend should be called to testify to these matters and that defendant was being denied his right to confrontation. The prosecutor said that the friend would be called and the judge overruled the objections and told the prosecutor to limit the number of questions to a few more. The prosecutor then asked if defendant knew why, if their relationship was good, Entrata was crying when she called her friend. Defendant testified he did not know, and defense counsel's objection that the question assumed facts not in evidence was overruled. Last, defendant was asked why Entrata would tell her doctor two days later that she had been raped. Defendant did not know why she would say that.

On redirect, defendant's counsel asked defendant if he had read the police reports on the sexual assault charge, to which he replied he had. He then was asked a number of questions relating the statements Entrata made about the sexual assault that were apparently contradictory or that would shed doubt on whether she had been raped.

Defendant claims that the prosecutor's questioning was improper because it required him to speculate about Entrata's motives and thought process. The State first argues that the contention these questions called for speculation has been waived and points out that, during the cross-examination, only one defense objection was based on the grounds that the question required defendant to speculate about Entrata's motive and thought process, and the objection was sustained. The other objections were either that the officers or the friend should be called to testify, that the questions assumed facts not in evidence, that there was a lack of foundation, or that defendant was denied his right to confrontation. The

State contends that an objection based on specified grounds waives all grounds not specified. The defendant, therefore, should not now be able to allege that the whole line of questioning was improper on grounds that it asked for speculation as to Entrata's motive.

We have held that an objection based upon a specified ground waives all grounds not specified, and a ground of objection not presented at trial will not be considered on review. (*People v. Stewart* (1984), 104 Ill. 2d 463, 489-90; *People v. Canaday* (1971), 49 Ill. 2d 416, 423-24.) We find that this principle does not preclude defendant from raising his objection before us. When the State began the line of questioning, defendant objected that it was an improper means of bringing into evidence the facts surrounding the rape, but the judge overruled the objection and said the prosecutor may ask the defendant a few question. Defense counsel, however, then stated that the questioning was "over objection." Moreover, later in argument to the judge, defense counsel raised numerous grounds for why a specific question or a whole line of questioning was improper, such as the questions call for speculation, violate the confrontation clause, and assume facts not in evidence. We hold that it is clear that objections were made to the questions, and that the grounds were not so specific as to preclude the defendant from contending the questions improperly called for speculation.

The State next claims that during the direct examination defendant said he and the victim had a good relationship and had engaged in a consensual sexual encounter. The State argues that this testimony allowed it to question the defendant about the sexual assault and that the questions were intended to reveal that defendant was lying about his relationship with Entrata and that he had motive to murder her. Generally, a witness may only testify as to facts which are within his personal

knowledge and recollection. (*People v. Williams* (1977), 66 Ill. 2d 478, 486; *People v. Krauser* (1925), 315 Ill. 485, 508; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §602.1 (5th ed. 1990).) Although cross-examination is limited to matters brought out on direct examination (*People v. Kirkwood* (1959), 17 Ill. 2d 23, 30), it is proper to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy that witness' direct testimony, even though they may incidentally constitute new matter which aids the cross-examiner's case. (*Williams*, 66 Ill. 2d at 486.) It is improper, however, to ask a witness to speculate about matters beyond his personal knowledge or to judge the veracity of other witnesses or evidence. (*People v. Turner* (1989), 128 Ill. 2d 540, 558; *People v. Griswold* (1950), 405 Ill. 533, 541; *Allen B. Wrisley Co. v. Burke* (1903), 203 Ill. 250, 257; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.25 (5th ed. 1990).) Nevertheless, the latitude permitted on cross-examination is left largely to the discretion of the trial judge and he will not be reversed absent an abuse of discretion which results in manifest prejudice to the defendant. *People v. Burris* (1971), 49 Ill. 2d 98, 104; *People v. Izzo* (1958), 14 Ill. 2d 203, 212.

The first two questions, wherein defendant was asked if he had any knowledge of why Entrata would tell the police and a friend that she had been sexually assaulted, are likely in the proper form because they ask generally if defendant has personal knowledge which would explain Entrata's behavior. It is possible that he did have such information. But when defendant denied committing the sexual assault and said that these specific facts were not within his personal knowledge, it was improper to continue to question about the numerous specifics that the prosecutor asked.

The prosecutor's questions delved into many statements the victim had made that raised specific facts relevant to her assault and subsequent behavior. However, at that time, the statements were not in evidence, the officer or friend had not testified about them and defendant denied having knowledge about the facts. The only testimony relating to the rape came from defendant's attorney, Melius, in the case involving the rape. Defendant may have opened the door on redirect when he asked about Entrata's statement. Nevertheless, Melius' testimony did not go into the details of the statements to the same degree as the questioning of the defendant by the prosecutor and those questions were restricted to the attorney's recollection of facts given in the statement; he was not asked to speculate about Entrata's motives. Moreover, the effect of that questioning of Melius cannot be considered as damaging as when the questions were posed to the defendant. The questions to defendant at most tenuously established motive or that he was lying, but more clearly they called for speculation and allowed into evidence the details of the rape. See also *J.L. Simmons Co. v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 114-15 (improper to impeach a witness with statements another person made and for which the testifying witness was not responsible).

Although the questions were not proper, we have held that improper cross-examination is not reversible error if it can be considered harmless. (See *J.L. Simmons*, 108 Ill. 2d at 114-15; *People v. Kirkwood* (1959), 17 Ill. 2d 23, 30.) In this case, however, we cannot conclude that the questioning was harmless. Defendant was on trial for murdering Entrata, but the questions were about facts specific to a previous sexual assault. The sexual assault was intricately related to the murder trial and certain facts surrounding it may have been admissible. (See *People v. McKibbins* (1983), 96 Ill. 2d 176, 182 (evidence

of the commission of another crime may be admissible to show motive).) However, defendant had not been proven guilty of the charge and Entrata's statements had never been subject to cross-examination. Defendant's cross-examination brought out numerous facts about the charge to which defendant had not testified, although his former attorney discussed some of the matters contained in the statements. We have held that it is error for the State to ask a defense witness questions presuming facts not in evidence as a precursor to impeachment of that witness, unless the State has admissible evidence to substantiate the inquiry. (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 353.) "The asking of the leading question and the denial carry a harmful innuendo which is unsupported by any evidence." (*People v. Burbank* (1972), 53 Ill. 2d 261, 270.) The danger inherent in such questioning is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question. (See *People v. Nuccio* (1969), 43 Ill. 2d 375, 381; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.21 (5th ed. 1990).) In this case, the questions in the form they were asked may well have been prejudicial because defendant had not been convicted of the sexual assault and we do not know exactly what occurred. However, it is likely the jury believed that the facts about the assault were as the prosecutor presented them and not as defendant contended.

The damaging and likely prejudicial effect of the prosecutor's questions is obvious. Defendant was the most important witness in this case. The questions brought out alleged facts that Entrata was accosted by a masked man, physically forced into an automobile, raped, and continually threatened. Afterwards, according to the prosecutor's questions, she was emotionally distraught and recounted details of the episode to a friend and the police. Also, she went to a doctor for

treatment. This cannot be characterized as incidental testimony on a minor matter. Although the evidence linking defendant to the murder was sufficient for the jury to find him guilty beyond a reasonable doubt, there was not such overwhelming evidence of guilt so as to find the errors harmless. (See *People v. Nuccio* (1969), 43 Ill. 2d 375, 396 (evidence of guilt was not so manifest that errors in cross-examination of defendant, amongst other errors, could be considered harmless); *People v. Kirkwood* (1959), 17 Ill. 2d 23, 30 (errors in cross-examination of defendant not so prejudicial as to require a new trial).) Defendant's contention, which is also the argument his trial counsel made, that the questioning was intended less to impeach defendant than to bring out all the details of the sexual assault does not seem an unreasonable characterization of the prosecutor's purpose, and in this case it cannot be characterized as harmless error to allow into evidence all of the cross-examination relating to the specifics of the sexual assault. See *People v. McKibbins* (1983), 96 Ill. 2d 176, 186-87 (improper to have a minitrial on prior crime in order to establish defendant's criminal intent).

A number of factors compounded the error in this case. First, during the defense's redirect examination, counsel was forced to delve into the merits of the sexual assault charge. Defense counsel, in order to rehabilitate defendant in the minds of the jurors, asked numerous questions about the charge which were designed to show that the allegations and evidence of sexual assault were weak, that Entrata made inconsistent statements, and that, therefore, defendant may have been found not guilty of the charge. Again, many of these questions were beyond the personal knowledge of defendant and may have been improper. However, because the State had explored the matter, the trial judge apparently felt the questions were proper.

Second, in rebuttal the State did not present the testimony of the officer or the friend to whom Entrata had spoken, as it represented that it would do during argument on the objections and at the side bar. Instead, records of the police report that were found at defendant's apartment were allowed into evidence. These records included statements by Entrata, her friend, defendant's girlfriend and defendant, in which he professed his innocence, as well as police department reports regarding evidence the police had discovered and tested. This form of rebuttal was not proper. Defendant had been asked on cross-examination if he knew why Entrata would make the statements she did. He answered that he did not know why she said those things. The rebuttal evidence, however, does not establish whether defendant knew why the statements were made; it only shows that they had been made. The State argues that the statements show motive and that defendant was lying. However, the facts that the two had engaged in a sexual encounter, Entrata then filed a complaint against him and there was sufficient evidence to go to trial on the case established defendant's motive. These facts also may have established that defendant was lying. Although the State may show that defendant was lying, asking defendant about the specifics contained in the statements and then admitting them into evidence during rebuttal is not the proper way to do that. Moreover, although the rebuttal established that the statements had been given, there is no indication of their truthfulness and defendant never was given an opportunity to effectively cross-examine the declarant or the persons to whom the statements were made. Defendant argued during his objections that he was being denied his right to confrontation when the statements given to the police were allowed into evidence during cross-examination. The State argued that the officer and friend would testify; however, they did

not. It was impossible for defendant to test the truthfulness of the statements when they were admitted through the police reports, and defendant, therefore, did not have an opportunity to cross-examine witnesses against him. See *People v. Johnson* (1987), 116 Ill. 2d 13, 25-29.

For these reasons, we find that not only was the questioning improper but it was also not harmless error. Of course, questions about the rape may be allowed during the cross-examination. The questions, however, should not require testimony beyond defendant's personal knowledge, nor should rebuttal consist only of the police reports. There are other ways to present this type of evidence, but not in the manner the State did so at the trial.

We therefore reverse the trial court and remand this cause to the circuit court of Lake County for a new trial on the murder charge.

*Reversed and remanded.*