2023 IL App (4th) 230176-U

NO. 4-23-0176

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FILED
November 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| VIDAL RAINEY, | ) | No. 20CF260 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Robert M. Travers, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice DeArmond and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant failed to carry his burden to show a clear or obvious error occurred regarding his claims of improper testimony and prosecutorial misconduct during closing argument.

¶ 2       Following a jury trial, defendant Vidal Rainey was convicted of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2018)) and the trial court sentenced him to six years in prison. In this direct appeal, defendant argues (1) he was denied his right to a fair trial when the State elicited testimony from its sole witness on a topic of which she had no personal knowledge and (2) the State improperly vouched for the credibility of its witness and argued facts not in evidence during closing arguments. For the reasons that follow, we affirm.

¶ 3                          I. BACKGROUND

¶ 4       At the time of the incident in question in this case, defendant was incarcerated at Pontiac Correctional Center (Pontiac). The State secured a grand jury indictment charging

defendant with one count of aggravated battery in that, while incarcerated, defendant "knowingly made physical contact of an insulting or provoking nature with Correctional Officer Jillian Morgan." The indictment went on to state that defendant grabbed Morgan's left buttock when he knew her to be a correctional officer engaged in the performance of her duties.

¶ 5        Following his first appearance, defendant waived his right to counsel and proceeded *pro se*; he subsequently requested and was granted the reappointment of counsel. Appointed counsel attempted to locate defense witnesses and subpoena surveillance footage of the incident from the Illinois Department of Corrections (DOC). It became apparent during pretrial hearings that there was a dispute between defendant and counsel regarding certain motions that defendant wanted to file that counsel deemed frivolous. Eventually, the disagreement between defendant and counsel led defendant to request, once again, to proceed *pro se*. After defendant was allowed to proceed *pro se*, DOC responded to the subpoena for surveillance footage by stating that there was no responsive video to provide.

¶ 6        At trial, the State called Morgan as its only witness. She testified that, while she was still employed by DOC, she no longer worked at Pontiac. At the time of the offense, she was undertaking her duties as a correctional officer while in a uniform that clearly represented she was a correctional officer. She was doing the routine "count" to make "sure that the inmates on every assigned gallery are where they are supposed to be." She was completing the count in the "West cell house" on "Gallery 5." In describing the layout, she explained there was a row of cells to her left, with approximately 22 cells from the beginning of the gallery to the end with a walkway in front of the cells. The inmates in those cells were segregated. There were only individual inmates in the cells, and the cell doors were bars, not plexiglass.

¶ 7        While she was completing the count, defendant "reached through the bars" and "grabbed me on my butt; and I jumped back, basically yelled at him, no." Another correctional officer was in the gallery with Morgan during the incident. He was in front of Morgan and did not see the incident, but once the offense occurred, they both "left the gallery and *** reported it." Later in her testimony, she noted that defendant had made comments of a sexual nature to her earlier in the day and attempted to pass her a note that she believed also contained sexual comments. She did not accept the note and rebuffed the comments.

¶ 8        Morgan's testimony then turned to the topic of surveillance cameras inside of the facility.

"Q. Okay. And now I want to talk to you a little bit about are there cameras in the facility?

A. Yes, there are.

Q. Okay. And do they cover the entire gallery or not?

A. Sometimes not, no.

Q. Okay. Is it fair to say, there might be some gaps—

A. Yes.

Q. —in the coverage—

A. Yeah.

Q. —from the entire row?

A. Uh-huh.

Q. And in this instance, were they able to capture this incident on camera?

A. No, they weren't."

¶ 9    On cross-examination, defendant asked Morgan how she knew the surveillance cameras did not record the incident. She responded, "I was informed." Under further questioning by defendant, Morgan advised that there was no video footage of the incident, and the surveillance cameras did not "reach" defendant's cell.

¶ 10    Defendant testified as the only witness in his defense. He asserted that on the date of the offense, he was housed in cell 513 on the odd side of gallery 5; he said there was a surveillance camera directly in front of his cell and another that could see the entire gallery. Morgan and another correctional officer walked by his cell together without incident. If there was an incident, the cameras would have captured it. Later, Morgan and the other officer "trumped up a discipline report falsely accusing [him] of reaching through the cell bar and grabbing her buttock while she was exiting the gallery."

¶ 11    The matter proceeded to closing arguments. Among other things the prosecutor asserted:

> "I would argue [Morgan] testified credibly about exactly what happened. She really has no motive at this point to make anything [up] or fabricate anything. She doesn't even work at [Pontiac] anymore. She's moved on, still working with the [DOC] in a different capacity. So, I would argue she has really no motivation to fabricate this. She, I would argue, testified very credibly and very candidly about exactly what happened; and I would argue that the order in which things happened really makes a lot of sense and I think lends a lot of credibility to what she says as well; that this was a pattern that kind of escalated over her shift. It starts with sexual comments, the innuendo, that kind of thing; then the defendant tries to give her a note that's just for her. And then it culminates with him reaching out between the cell bars and

grabbing her in the buttock. So, I would argue that the sequence also is very credible and makes a lot of sense in this case; and I'd ask that you find the defendant guilty."

¶ 12 The gist of defendant's closing argument was that there were numerous surveillance cameras present with one facing each gallery, and he questioned how the incident could not have been recorded. He exclaimed to the jury "Where is the evidence? Where is the witness that [Morgan] was walking with on the gallery? No witnesses, no evidence at all."

¶ 13 In its surrebuttal, the prosecution again commented:

"Again, the testimony of Jillian Morgan, I would argue very credible testimony about exactly what happened that day; and, again, I would argue in a fashion that escalated, and it makes a lot of sense. This started with sexual comments and things like that, then the attempted passing of a note that was just for her, and then culminated with the defendant grabbing Ms. Morgan on the butt when she was trying to walk by and do the 9:30 p.m. count. I would argue that's exactly what happened, that's the evidence that you've heard from her."

¶ 14 The prosecution also commented on the lack of surveillance video:

"I would argue that, you know, with respect to the video cameras, you also heard her explanation on that; that there are some gaps along the gallery and that would make sense that this incident wasn't captured on any of the cameras because of that.

Also, I would argue to you the idea that anyone that's currently housed at [Pontiac] would really have an idea where those cameras are, doesn't make a lot of sense. Obviously, those are for security purposes; so, letting anyone being housed at [Pontiac] know the location and the direction that they're pointed

wouldn't make a lot of sense security wise. In addition, we heard a correctional officer testify that they were not covering this incident. This is a correctional officer that would know actually where the cameras were pointing and testified that there was no coverage because, based on the location and the direction that they are pointed. So, I would argue that that obviously makes a lot of sense in this case."

¶ 15    Following deliberations, the jury found defendant guilty, and the trial court sentenced him to an additional six years in prison. This appeal followed.

¶ 16    After the Office of the State Appellate Defender (OSAD) filed a brief on behalf of defendant, it moved to withdraw as his counsel due to defendant's request to proceed *pro se*. We allowed OSAD to withdraw and instructed defendant that any motion seeking to amend his brief must be filed before the State filed its appellee brief. The State filed its appellee brief on August 23, 2023, and defendant filed a motion to amend his opening brief on September 12, 2023; we denied the motion. No reply brief was filed by defendant.

¶ 17                                II. ANALYSIS

¶ 18    Defendant argues the State violated his right to a fair trial by eliciting testimony from Morgan concerning video footage when she lacked the personal knowledge necessary to do so. He also argues there was prosecutorial misconduct during closing arguments that deprived him of a fair trial when the prosecution improperly vouched for the credibility of Morgan and made speculative remarks that were not legitimate inferences from the facts in evidence.

¶ 19    Defendant acknowledges that he has failed to preserve these issues for appeal and instead asks for review under the first prong of the plain error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (finding that to preserve an issue for review, a party must raise the issue at

trial and in a written posttrial motion). The first prong of the plain error doctrine allows a reviewing court to bypass the normal principles of forfeiture and review unpreserved errors when "a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in plain error review is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2022 IL 127256, ¶ 21.

¶ 20                                                    A. Witness Testimony

¶ 21            Illinois law is well established that "a witness may only testify as to facts which are within his personal knowledge and recollection." *People v. Enis*, 139 Ill. 2d 264, 294-95 (1990); see Ill. R. Evid. 602 (eff. Jan. 1, 2011) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). "The testimony of lay witnesses is typically limited to *** what they did, saw, heard, smelled, tasted, or touched." *People v. Pingelton*, 2021 IL App (4th) 180751, ¶ 47. It is improper for counsel to "ask a witness to speculate about matters beyond his personal knowledge or to judge the veracity of other witnesses or evidence." *Enis*, 139 Ill. 2d at 295.

¶ 22            Defendant argues Morgan's testimony that the surveillance cameras did not capture this event was testimony unsupported by her personal knowledge. Defendant cites *People v. Himber*, 2020 IL App (1st) 162182, ¶¶ 34-35, as support, where the witness testimony at issue rested entirely on an assumption of what happened and not the witnesses' own observations or those of another that were then relayed to him. In that case, the reviewing court found that the speculative testimony could not provide the basis for a lesser included offense jury instruction. *Id.* ¶ 33. We find defendant's invocation of *Himber* to be inapt. On cross-examination, Morgan stated that she "was informed" that no video of the incident existed. As opposed to merely

engaging in speculation or assumption, her testimony appears to be hearsay as she had knowledge of the lack of footage by way of being "informed" either by an audible comment she heard or a written one to that effect that she saw. Defendant failed to object to this testimony at trial. As axiomatic as the proposition that a witness must have personal knowledge of the matters testified to is the proposition that hearsay testimony admitted without objection " 'is to be considered and given its natural probative effect.' " *People v. Collins*, 106 Ill. 2d 237, 263 (1985) (quoting *People v. Akis*, 63 Ill. 2d 296, 299 (1976)).

¶ 23    Accordingly, having found that no error occurred regarding Morgan's testimony, there cannot be plain error and we must honor defendant's procedural forfeiture.

¶ 24                                    B. Closing Argument

¶ 25    We turn next to defendant's contentions of prosecutorial misconduct. "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). We review the closing arguments made by prosecutors in their entirety and do not simply focus on the challenged remark. *Id.* at 122. In order to reverse, the prosecutor's comment "must have been damaging enough that it severely threatened to tip the scales of justice against the defendant." (Internal quotations omitted.) *People v. Williams*, 2022 IL 126918, ¶ 57. As with defendant's other contention of error, our review, in the first instance, is to determine whether a clear or obvious error occurred. *Jackson*, 2022 IL 127256, ¶ 21.

¶ 26                                    1. *Bolstering*

¶ 27    Defendant argues that the prosecution improperly and repeatedly asserted its personal opinion about the credibility of Morgan. Specifically, defendant points to the phrase "I would argue" as "phraseology meant to convey an appearance of proper argument." Defendant points to the following statements from the prosecutor's closing argument: "I would argue

[Morgan] testified credibly," "I would argue she has really no motivation to fabricate this," and "I would argue [she] testified very credibly and candidly."

¶ 28          While it is within the wide latitude afforded to prosecutors to argue that a witness is or is not credible, they are prohibited from both personally vouching for the credibility of a witness and bolstering witness testimony using the credibility of the state's attorney's office. *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126; *People v. Potts*, 2021 IL App (1st) 161219, ¶ 280. In this context, improper argument only occurs when the prosecutor *explicitly* offers a personal opinion about the witnesses' credibility. *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996). Further, a prosecutor's statements that were provoked or invited by the defense are not improper. *Williams*, 2022 IL 126918, ¶ 44; *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 29          We are unable to find that a clear or obvious error occurred and are unpersuaded by defendant's contention that the prosecution was using mere "phraseology" to couch personal opinions about the credibility of Morgan's testimony. As laid out above, the credibility of the witnesses is fair game for comment by the prosecution as long as explicit personal opinions are avoided. See *Pope*, 284 Ill. App. 3d at 707 ("[W]e expressly reject the notion that a prosecutor improperly crosses the bounds of asserting his personal views regarding witnesses' credibility or defendant's theory of the case if the jury has to infer the prosecutor is doing so from his comments." (Emphasis omitted.)). This is especially true in this case, where defendant aggressively attacked Morgan's credibility during his testimony and claimed that she falsified an incident report and falsely accused him of committing the offense at issue. The prosecution responded to this testimony by using the preface "I would argue" when opining about the credibility of Morgan and sought to support that conclusion by relying on the logical sequence of events, natural inferences therefrom, and the absence of a motive to lie. Viewing the prosecution's

closing argument in its entirety—as we must—the prosecution did not *explicitly* convey to the jury an expression of a personal opinion regarding Morgan's credibility.

¶ 30 Defendant further points to the prosecution's argument that Morgan had no motive to lie as unsupported by the evidence. Again, defendant aggressively attacked Morgan's credibility during his testimony and closing argument without presenting any motive for her to falsify the claim against him. In responding to these comments, the prosecution merely commented on defendant's failure to submit any evidence that tended to support the defense's theory. See *People v. Albanese*, 104 Ill. 2d 504, 522 (1984) (stating a prosecutor may comment on the "defendant's failure to submit any evidence that would tend to refute the case against him").

¶ 31 Accordingly, we must honor defendant's procedural default.

¶ 32 2. *Facts Not in Evidence*

¶ 33 Defendant also argues the prosecution engaged in misconduct by arguing facts not in evidence during closing arguments to undermine his testimony. Specifically, he points to the comments made about the lack of surveillance footage of the offense and the placement of cameras within the facility at Pontiac.

¶ 34 While the prosecution "may comment on the evidence and any fair, reasonable inferences it yields," it is improper "to argue assumptions or facts not based upon evidence in the case." (Internal quotation marks omitted.) *People v. Adams*, 2012 IL 111168, ¶¶ 17-18. As noted above, "[c]hallenging a witness's credibility may invite a prosecutor to respond, but it does not give the prosecutor *carte blanche* to make up evidence during closing argument." *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 47. Again, we review to determine whether a clear or obvious error occurred. *Jackson*, 2022 IL 127256, ¶ 21.

¶ 35 We first address the comments by the prosecutor that Morgan testified that surveillance cameras did not capture the offense and that she had knowledge of the cameras' locations and angles. Morgan testified that she was informed that there was no surveillance footage of the incident and that there were gaps in the surveillance coverage of the gallery. Defendant acknowledges this testimony but argues that it could not provide a basis to argue Morgan "knew what areas [were] and [were not] recorded because she was a correctional officer." This argument is unavailing, as the focus of the comment was not the overarching surveillance apparatus at Pontiac but the fact that there was no footage of this incident, and the natural inference flowing from that testimony and lack of footage is that the cameras were not angled in a manner to record the area at issue. Given the prosecutor's argument was based on testimony in the case and naturally arising inferences therefrom, these comments do not constitute error.

¶ 36 Defendant also takes issue with the prosecutor's comments that "security wise," it did not "make a lot of sense" to allow inmates at Pontiac to know the location of cameras or the direction in which they were pointed. He argues that there is no testimony to support this assertion. The record in this case indicates that regardless of the argument made by the prosecutor, there was no video evidence that captured this incident. This is clear from the unobjected-to testimony of Morgan and the returned subpoena from DOC stating no footage existed. Indeed, in response to defendant's arguments that there was no evidence of the incident in the case and the inference advanced by him that there was surveillance video in this case that the State was refusing to produce, the prosecution had the right to respond by informing the jury of defendant's ability to subpoena and present those records himself. See *People v. Kliner*, 185 Ill. 2d 81, 154 (1998) (finding it was proper for the prosecution to respond to inferences advanced by defense counsel by commenting on defendant's subpoena powers). It is apparent from Morgan's testimony and the

nonexistence of footage that defendant was not aware of the angle of the camera. These comments from the prosecutor are not damaging enough to severely threaten to tip the scales of justice. *Williams*, 2022 IL 126918, ¶ 57; see *People v. Smith*, 2016 IL 119659, ¶ 39 ("In applying the plain error doctrine, *** absent reversible error, there can be no plain error.").

¶ 37 Once again, we must honor defendant's procedural default.

¶ 38 C. Cumulative Error

¶ 39 Finally, defendant claims that the cumulative impact of the errors during his trial necessitates that he receives a new trial. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005) (citing *People v. Blue*, 189 Ill. 2d 99, 139 (2000)). Our review of defendant's contentions reveals no errors occurred. Absent error, a defendant cannot prevail on a claim of cumulative error. See *People v. Caffey*, 205 Ill. 2d 52, 118 (2001). Accordingly, the claim of cumulative error lacks merit.

¶ 40 III. CONCLUSION

¶ 41 For the reasons stated, we affirm the trial court's judgment.

¶ 42 Affirmed.