# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Stevens, 2013 IL App (1st) 111075**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK STEVENS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1075 |
| Filed | June 14, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated criminal sexual assault was upheld over his contentions that the trial court erred in admitting evidence of his prior aggravated criminal sexual assault conviction and in allowing the prosecution to cross-examine him about that conviction, since the similarities between the offenses were sufficient to qualify as "general areas of similarity," and cross-examination of defendant about the prior offense was relevant and admissible to impeach defendant's contention that his conduct with the instant victim was consensual. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-21582; the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, Jonathan Steffy, and Brett C. Zeeb, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Anthony O'Brien, and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.

Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant, Mark Stevens, was convicted of three counts of aggravated criminal sexual assault and sentenced to 60 years' imprisonment. On appeal, defendant contends the trial court abused its discretion in admitting proof of a prior aggravated criminal sexual assault. Defendant additionally contends the trial court erred in allowing the State to question him on cross-examination regarding evidence of the prior aggravated criminal sexual assault in violation of his right against self-incrimination. Based on the following, we affirm.

¶ 2                                    FACTS

¶ 3     Prior to trial, the State filed a motion *in limine* seeking to admit other crimes evidence regarding three aggravated criminal sexual assaults. Defendant filed an objection and answer. A hearing was held on the motion. The State argued that the three aggravated criminal sexual assaults occurred within six years of the offense at issue, that all of the sexual assaults were factually similar, and that the three sexual assaults were probative to show defendant's identity, intent, motive, common scheme or design with regard to the sexual assault at issue, as well as defendant's propensity to commit sex crimes. Defendant argued that the circumstances of the other cases varied greatly from those related to the offense in question and that the evidence of the other sexual assaults was "inherently unreliable." The trial court granted the State's motion and admitted the other crimes evidence, finding there were no differences between all of the sexual assaults that precluded them from being relied upon in the case at bar, that the cases were relevant to show motive, identity, and propensity, and that the probative value of the other crimes evidence outweighed any prejudicial effect on defendant.

¶ 4     At trial, the victim, B.P., testified that on October 1, 2002, she was 13 years old. On that date, she returned home from school around 3:30 p.m. and then proceeded to the mall to buy her mother a birthday present. The mall was located approximately 10 blocks from her home,

-2-

which was located on N. Lawler Avenue, in Chicago, Illinois. B.P. intended to return home by her curfew of 8:30 p.m. B.P. was with a friend while at the mall; however, the friend had to leave at some point. As a result, B.P. left the mall alone and began walking home. It was dark outside at the time. After walking for approximately one block, B.P. heard a male voice say "come here." B.P. ignored the man and continued walking without turning around. The man, however, repeatedly demanded that B.P. "come here." B.P. attempted to walk faster, but the man ran up from behind and grabbed B.P. The man, whom B.P. later identified as defendant, forced B.P. into the back of a car parked nearby. Another male was already seated in the back of the car. Defendant proceeded to the driver's seat. B.P. testified that she tried to exit the car by "yanking on the door," but the doors were locked and the windows did not function. According to B.P., she noticed an object on defendant's hip that appeared to be the handle of a handgun.

¶ 5    B.P. testified that defendant drove the car for approximately one hour. Defendant then stopped the car, exited, and instructed B.P. to exit the car as well. Defendant grabbed B.P. by the arm and led her to the basement of an apartment building where she was left alone for 5 to 10 minutes. B.P. testified that she attempted to flee from the basement, but it was dark and she could not find an exit. When defendant returned to the basement, he ushered B.P. to the front of the apartment building. B.P. did not observe the man that had been seated in the backseat of the car nor anyone else in the building. B.P. testified that defendant directed her to a landing between the first and second floors of the building and instructed her to remove her clothes. B.P. complied and defendant removed his pants. Defendant demanded that she put her mouth "on his dick." B.P. was afraid so she complied, performing oral sex for approximately 5 to 10 minutes. Then, defendant instructed B.P. to get up and turn around at which time he forced his penis inside B.P.'s anus. B.P. was in pain and testified that defendant engaged in anal sex for about 10 to 15 minutes. Thereafter, defendant instructed B.P. to move yet again at which time he forced his penis into B.P.'s vagina for 20 to 30 minutes. According to B.P., she could not stop defendant or move from underneath his weight.

¶ 6    B.P. further testified that she heard an individual enter the apartment building. In response, defendant stopped, put on his clothes, and left the building. B.P. dressed, but waited approximately 10 to 15 minutes before leaving the building for fear that defendant was lingering outside or would return. When she exited the building, B.P. ran to the nearest bus stop. B.P. rode two buses in order to get home. Upon arriving home, B.P. observed that her mother, Sheila Thomas, was speaking to a police officer. B.P. testified that she refused to tell the officer where she had been. However, once the officers left her home, B.P. informed Thomas about the offense.

¶ 7    According to B.P., Thomas took her to the hospital where a doctor performed a pelvic exam and swabbed her vagina and anus. While at the hospital, B.P. described the offense to the police and gave the police the clothes that she had been wearing. A couple of days after the offense, the police returned to B.P.'s house and requested that she show them where the sexual assault occurred. B.P. refused out of fear for her safety.

¶ 8    B.P. additionally testified that she spoke to the police in 2008. At that time, B.P. agreed to view a photographic array. B.P. identified defendant as the assailant in 2002 and became

physically ill and vomited after doing so. A couple of weeks later, B.P. viewed a lineup and again identified defendant as her assailant. B.P. identified defendant for a third time in court.

¶ 9    According to B.P., she observed defendant at least two times prior to the offense in question. B.P. said she observed defendant standing across the street from her school. B.P. noticed defendant because he was older than the kids at school and he would "just stand there." B.P. never spoke to defendant prior to the offense.

¶ 10   On cross-examination, B.P. could not recall having told police on the night of the offense that defendant pointed a gun at her head, that there were three attackers, and that the assault took place in an apartment unit within the building.

¶ 11   Thomas testified that, on October 1, 2002, her 13-year-old daughter, B.P., had a curfew of 8:30 p.m. When B.P. was not home by her curfew, Thomas called the police. Sometime after the police arrived at her home, B.P. walked into the house. According to Thomas, B.P. appeared frightened. B.P. informed Thomas that she had been raped. Thomas could not recall whether B.P. provided the information regarding the rape in the presence of the police. Thomas then took B.P. to the hospital emergency room to be examined by a doctor.

¶ 12   The parties stipulated that, if called by the State, Doctor Monique Karaganis, an expert in pediatric medicine, would testify that she examined B.P. on October 1, 2002, at Cook County Hospital. Dr. Karaganis conducted a pelvic exam and observed a two-millimeter tear in B.P.'s hymen and two tears in her rectum, as well as bloody semen in B.P.'s vagina and rectum. Dr. Karaganis collected vaginal and oral swabs from B.P. and placed the swabs in an Illinois State Police sexual assault collection kit. Dr. Karagnis would testify that her findings were consistent with the use of force or forceful intercourse, but that she could not opine on the degree of force used or whether the intercourse was consensual.

¶ 13   The parties additionally stipulated that, if called by the State, a number of individuals would testify regarding the chain of custody of the sexual assault evidence kit, as well as B.P.'s undergarments, which were tested by the Illinois State Police crime lab. One male DNA profile was recovered from the samples in addition to B.P.'s DNA profile.

¶ 14   R.G. testified that, on September 3, 2008, she was 21 years old and lived on E. 68th Street in Chicago, Illinois. At the time, R.G. worked as a security officer at the Home Depot located on Cicero and Armitage in Chicago, Illinois. On the date in question, she left work at 9 p.m. and was on the Roosevelt Street "L" train platform when a man approached her from behind, pointed something hard and sharp in her back, and told her to go with him. The man warned R.G. that he would kill her if she screamed; R.G. complied out of fear. R.G. testified that she had never observed the man, whom she later identified as defendant, prior to that day. Defendant directed R.G. to a different train platform and they boarded a train. The pair transferred trains a number of times before exiting at the "UIC" stop.

¶ 15   Defendant directed R.G. to a nearby hotel on Ashland Avenue and requested a room. Defendant forced R.G. into the room and demanded that she remove her clothes. R.G. complied. Defendant then searched through R.G.'s clothing and found a switchblade knife that she carried for protection. According to R.G., defendant demanded that she "suck [his] dick," but she refused. In response, defendant grabbed R.G. and threatened to kill her if she did not perform oral sex. R.G. began crying and complied while defendant threatened her

with her knife. R.G. continued oral sex for 45 to 60 minutes.

¶ 16    According to R.G., she attempted to escape from the room, but defendant grabbed her and choked her. R.G. said she screamed and believed she was going to die. Defendant then pushed R.G. to the ground and threatened to rape her. R.G. pleaded with defendant, but he attempted to force his penis into R.G.'s anus. R.G. continued to plead with defendant and informed him that she was menstruating. Defendant turned R.G. over onto her back and pinned her down with the weight of his body. As R.G. struggled, defendant inserted his penis into her vagina. Defendant initially wore a condom, but removed it at some point prior to ejaculating. Defendant continued to hold R.G.'s knife. After the assault, defendant forced R.G. to lie down with him and instructed that he would kill her if she told anyone about the offense. R.G. noted that her cellular phone rang twice during the incident. Defendant instructed her to answer the phone and "act natural."

¶ 17    According to R.G., she and defendant left the hotel room and went to a gas station convenience store before boarding another train. Prior to exiting the train, defendant reminded R.G. not to report the incident to anyone. Defendant told R.G. that he would call her the next day and then he exited the train. R.G. testified that she had not given defendant her phone number. Once alone, R.G. called her friend and told her about the offense. In addition, when she arrived home, R.G. reported the offense to her mother. R.G.'s mother called for an ambulance, which transported R.G. to the hospital where a "rape kit" was performed. While at the hospital, R.G. spoke to two detectives. R.G. later accompanied the detectives to the hotel where the offense took place.

¶ 18    R.G. further testified that, prior to the date in question, she had received strange phone calls, which she later realized were from defendant. R.G. had no prior knowledge of defendant and did not know how he obtained her phone number. Defendant referred to himself as "Drayday" on the phone.

¶ 19    On cross-examination, R.G. identified herself on footage from video surveillance of the Chicago Transit Authority platforms and the convenience store on the date in question demonstrating that R.G. was at times following behind defendant or at a distance of 8 to 10 feet from defendant.

¶ 20    Detective Anthony Padilla testified that in October 2008 he was assigned several sexual assault cases linked to defendant. Detective Padilla showed B.P. a photographic array, during which she vomited upon seeing a picture of defendant. B.P. positively identified defendant as committing the offense against her in 2002. Detective Padilla testified that he arrested defendant at his grandmother's house on October 29, 2008. According to Detective Padilla, B.P. positively identified defendant in a police lineup. Then, after initially refusing, defendant complied with a warrant to produce a buccal swab. Detective Padilla further testified that he investigated defendant in relation to R.G.'s assault. Detective Padilla recovered a hotel card from the Rosemore Hotel on Jackson and Ashland. The card contained defendant's name and address.

¶ 21    The parties stipulated that a proper chain of custody was maintained for defendant's buccal swab. The parties further stipulated that, if called by the State, Ryan Paulsen, an expert in forensic DNA analysis with the Illinois State crime lab, received defendant's buccal

swab and a DNA profile from B.P.'s evidence that was suitable for comparison. Paulsen concluded that the male DNA found on B.P. matched defendant's DNA profile obtained from his buccal swab.

¶ 22    The State rested its case-in-chief and defendant requested a directed finding. The request was denied by the trial court.

¶ 23    The parties agreed to stipulate that, if called by defendant, Officer Guereca would testify that he responded to a call of a missing person on October 1, 2002. Officer Guereca would testify that he was present at B.P.'s house when she returned after the offense and she did not report the assault. The parties additionally agreed to stipulated that, if called, Officers Maltos and Crespo would testify that they interviewed B.P. at the hospital on the night of the offense and B.P. reported that three men were involved, that one of the men pointed a handgun to her head, and that the offender's car was parked in the mall parking lot. By way of stipulation, Officer Gallagher, if called by defendant, would testify that he also interviewed B.P. on the night of the offense. B.P. reported that the incident took place in a third-story unit in the building located at 55th Street and Halsted Avenue in Chicago, Illinois, and that two other men were waiting inside the building. The final stipulation offered was that, on October 1, 2002, B.P. told medical personnel at the hospital that she was attacked by African-American males that put a handgun to her head and instructed her to get into a car.

¶ 24    Defendant testified that he met B.P. on a phone chat line two weeks prior to October 1, 2002. Defendant provided B.P. with his personal phone number, which she used after exiting the chat line. According to defendant, he and B.P. engaged in five or six phone conversations prior to meeting. Defendant was aware that B.P. lived with her mother and that her grandmother lived on the second floor. B.P. also told defendant that she could only call him after 3 p.m. because that was when her mother was not home. B.P. said she was 18 years old. Defendant testified that he met B.P. once and they engaged in consensual sex.

¶ 25    On cross-examination, defendant testified that he had used aliases in the past. Defendant initially denied taking B.P. to his home located on W. Garfield Boulevard in Chicago, Illinois. Defendant acknowledged that Garfield Boulevard is also known as 55th Street. However, defendant testified that B.P. asked to meet him, and because he was on house arrest, he brought B.P. to his house. Defendant said he and B.P. had planned on "sexual activity." Defendant testified that he lived with his mother, but she was not home at the time. According to defendant, B.P. did not look like she was 13 years old. Defendant said he was 26 years old at the time. Defendant described the building he lived in as a three-flat with six units. He lived on the first floor. The building had a basement and a small parking area in the rear.

¶ 26    According to defendant, B.P. requested marijuana when she arrived to his house. Defendant did not have any marijuana, so he sent B.P. to a nearby gas station, first alone and then with a neighbor from the second floor, to obtain a "blunt." Upon their return, the neighbor and B.P. proceeded to smoke the "blunt." Thereafter, B.P. told defendant that she needed to be home by 8 p.m., which defendant did not find strange. Defendant suggested that the pair move to the third floor to avoid the potential of his mother coming home. Defendant had access to the unoccupied third-floor apartment because he was the building janitor.

Defendant asked B.P. if she was sure she wanted to "do this" and she replied, "yeah, that's the reason why I came." According to defendant, B.P. wanted to "try everything" and requested to perform oral sex on defendant. After completing oral sex, B.P. requested anal sex. Defendant testified that he wanted to "wait on that" because he "really didn't want to do it because [he] thought it was kind of messed up." B.P. agreed to vaginal sex, as suggested by defendant. Afterward, B.P. continued to want to engage in anal sex, so defendant complied. Defendant did not use a condom, but he did not ejaculate. Defendant testified that he later ejaculated after engaging in vaginal sex for a second time. According to defendant, B.P. consented to him tearing her vagina and rectum. Defendant denied seeing blood when he "washed up" after the sexual activities. Defendant testified that B.P. called him the next day and did not mention having been to the hospital or having spoken to the police.

¶ 27    Defendant further testified that he had been in B.P.'s neighborhood before and that his aunt and cousin, Donte Manuel, lived across the street from the mall. When asked about R.G., defendant denied knowing whether Manuel ever dated R.G. Defense counsel objected, arguing that defendant's direct examination was "limited to the active case, not proof of other crimes." The trial court overruled the objection, noting that defendant's credibility was at issue and stating:

"I don't know how you can limit it like that. You're right it's an active case but he chose to testify and part of the evidence that he's facing on a case that's currently before me is the evidence of proof of other crimes and this notion that somehow something is off limits or that this is a limited testimony would be a novel concept in my view under the law.

***

His credibility is at issue. You're telling me that if an attorney such as yourself calls a witness and somehow just wants to talk about A and B and C and this other incident which is an aspect of the credibility of the witness is somehow off limit because–

* * *

*** [U]nder these circumstances, under these condition[s], his credibility, it was introduced for propensity which obviously whether or not that other incident occurred or how he might explain it would be something that would be relevant in this case also."

¶ 28    Defense counsel responded by arguing that defendant had a separate and distinct fifth amendment right against self-incrimination for each case, and although he waived that right for one case, he did not waive his rights in both cases. The trial court provided defense counsel a 45-minute recess to find case law to support his argument. When the trial resumed, the court ruled that the State could cross-examine defendant regarding the R.G. case. Based on the trial court's ruling, defense counsel then requested to speak to defendant in order to potentially strike his testimony from the record. The court denied the request where the State's pretrial motion to admit other crimes evidence was granted after the court engaged in a balancing test to consider probative value of the evidence versus its prejudicial effect on defendant, the other crime was introduced during the State's case-in-chief, and defendant choose to waive his fifth amendment rights by testifying regarding the B.P. offense.

¶ 29    When cross-examination resumed, defendant testified that he met R.G. at a bus stop at

Cicero and Lake. Defendant had pulled his car up to the corner and asked to speak to R.G. Defendant exited his car and R.G. asked whether he had any marijuana. Defendant responded in the negative, but R.G. provided defendant with her phone number. According to defendant, he and R.G. made plans to meet later at the Cicero green line "L" stop. Defendant denied telling R.G. that his name was "Dre Dre." Defendant testified that the pair met as planned, but did not go anywhere. R.G. was wearing a work uniform. About one week later, the pair met at the Roosevelt green line "L" stop. Defendant and R.G. boarded the train and switched trains to a blue line train. The pair disembarked at the "UIC" stop. Defendant and R.G. patronized a gas station prior to going to a hotel. Defendant paid for a room using his identification in order to gain the rental. On the way to the room, defendant purchased snacks from a vending machine.

¶ 30    Once in the hotel room, the pair watched television, smoked marijuana, and drank alcohol. In exchange for the marijuana, R.G. told defendant she would perform oral sex on him. Defendant requested vaginal sex, but R.G. refused because she was menstruating. R.G. eventually stopped performing oral sex and defendant again requested vaginal sex. When R.G. refused, defendant removed her pants to inspect whether she actually was menstruating. R.G. had lied because she did not want to have vaginal sex. Defendant then demanded his marijuana and R.G. refused. R.G. inquired whether defendant had a condom. Defendant left the room to obtain a new condom from the hotel office. According to defendant, when he returned, he and R.G. had vaginal sex during which he wore a condom. Defendant testified that he ejaculated into the condom.

¶ 31    After the sexual activity was completed, defendant and R.G. left the hotel and walked to a gas station where defendant purchased water. Defendant and R.G. then proceeded to the "L" station. They boarded a train and both exited at the 69th Street stop. Defendant testified that the pair spoke for 15 to 20 minutes after exiting the train. The pair then parted ways.

¶ 32    Defendant testified that he was arrested the following day. He was read his *Miranda* rights. Defendant recalled requesting to speak to an attorney. Defendant denied speaking to any detective. When the State presented several statements defendant allegedly made to Detective Donte Cervin, defendant either stated that he could not recall the statements or denied having talked to the detective. Defendant additionally denied making any statements to an assistant State's Attorney (ASA).

¶ 33    During the State's rebuttal, Detective Cervin testified that he investigated R.G.'s sexual assault case. Detective Cervin initially interviewed R.G. while she was in the hospital. R.G. later directed Detective Cervin to the hotel where the offense occurred. Detective Cervin obtained the registration card signed by defendant when he rented the hotel room. The registration card provided defendant's address.

¶ 34    Detective Cervin testified that he interviewed defendant at the police station after advising him of his *Miranda* rights. Defendant never requested an attorney. According to Detective Cervin, defendant said he and R.G. spoke on the phone approximately 10 to 15 times prior to meeting on September 3, 2008. Defendant told the detective that he and R.G. agreed to meet at 8 p.m. or 9 p.m. at the Roosevelt and Lake green line "L" stop and then to proceed to a hotel room to smoke marijuana and drink alcohol. Defendant said R.G. agreed

to have sex with him for $60 and marijuana. When the pair met, defendant and R.G. went directly to the Rosemore hotel where defendant checked in and provided his identification. When R.G. requested the promised marijuana, defendant said he did not have any. Instead, defendant reported that R.G. agreed to have sex with him for $65. Defendant told Detective Cervin that he paid R.G. $40. R.G. asked defendant not to leave her alone, so the pair left the hotel together. Defendant said they walked to the BP gas station on Ashland where he bought two bottles of water and potato chips. Defendant and R.G. then walked to the train station. Defendant said he had consensual sex with R.G. for money. When the pair left the hotel room, R.G. was not upset or crying.

¶ 35    Detective Cervin further testified that he confronted defendant with R.G.'s account of the offense. Defendant denied R.G.'s account. After telling defendant that he had obtained video surveillance from the CTA which showed R.G. crying, defendant told Detective Cervin that R.G. cried three of four times on the train. Moreover, the video surveillance from the gas station showed defendant purchasing a small item that did not resemble bottled water or a bag of chips.

¶ 36    Detective Cervin additionally testified that he had a second conversation with defendant during which he reported that R.G. cried the entire way home. Defendant later told Detective Cervin that his cousin Manuel dated R.G. Defendant was unaware of whether R.G. knew he was Manuel's cousin.

¶ 37                                    DECISION
¶ 38                    I. Admissibility of Other Crimes Evidence
¶ 39    Defendant contends the trial court erred in allowing the State to present prejudicial propensity evidence in violation of section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2002)).

¶ 40    It is within the trial court's sound discretion whether to admit evidence of a prior criminal offense, and we will not reverse that decision on appeal unless there was a clear abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). An abuse of discretion will be found only when a trial court's decision is "arbitrary, fanciful or unreasonable" or "where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 41    In general, evidence regarding other crimes is inadmissible when its purpose is to demonstrate a defendant's propensity to commit a crime. *Id*. at 170. Instead, other crimes evidence is admissible to prove certain facts, such as "intent, *modus operandi*, identity, motive, [and] absence of mistake." *Id*. at 170, 173. However, pursuant to section 115-7.3 of the Code, the legislature created an exception to the common law bar against the use of other crimes evidence to demonstrate propensity in cases where a defendant is accused of criminal sexual assault. 725 ILCS 5/115-7.3 (West 2002).

¶ 42    Pursuant to section 115-7.3(c) of the Code, prior to admitting other crimes evidence, a trial court must weigh the probative value of the evidence against the undue prejudice to the defendant. 725 ILCS 5/115-7.3(c) (West 2002). In doing so, a trial court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity

-9-

to the charged or predicate offense; or (3) other relevant facts and circumstances." *Id*. When the evidence meets the threshold requirement of relevance and contains probative value, it is presumed to be admissible if its probative value is not substantially outweighed by its prejudicial effect. *Donoho*, 204 Ill. 2d at 182-83. Moreover, in *Donoho*, the Illinois Supreme Court interpreted section 115-7.3 to allow evidence of other crimes to demonstrate other relevant matters, including a defendant's propensity to commit sex offenses. *Id*. at 176. In cases involving criminal sexual assault, such as the one here, other crimes evidence is probative to rebut a defendant's claim of consent. *People v. Boyd*, 366 Ill. App. 3d 84, 93 (2006).

¶ 43    The question on appeal is whether the trial court abused its discretion when it ruled that the prejudicial effect of the evidence of defendant's prior offense was not substantially greater than its probative value. Defendant argues that the trial court abused its discretion in applying the balancing test prescribed by section 115-7.3(c) of the Code where the R.G. incident occurred six years after the charged conduct and where the B.P. and R.G. cases were factually dissimilar.

¶ 44    Turning to the first factor in the balancing test, there is no bright-line rule regarding when a defendant's other crimes are *per se* too remote. *Donoho*, 204 Ill. 2d at 183. In *People v. Illgen*, 145 Ill. 2d 353 (1991), the supreme court advised:

"As a general rule, other offenses which are close in time to the charged offense will have more probative value than those which are remote. Nevertheless, the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged. The decision whether to admit or exclude such evidence must be made on a case-by-case basis by the trial judge responsible for evaluating the probative value of the evidence." *Id*. at 370.

¶ 45    Here, six years elapsed between the offense against B.P. and the offense against R.G. While relevant in considering the probative value of the evidence, this time elapse is insufficient to find an abuse of discretion by the trial court. *Donoho*, 204 Ill. 2d at 184 ("while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it"); *People v. Ross*, 395 Ill. App. 3d 660, 677 (2009) (finding a 17-year time elapse between crimes, which was mitigated by the defendant's 5 years of incarceration, was insufficient to support a finding of an abuse of discretion).

¶ 46    Turning to the second factor in the section 115-7.3(c) balancing test, other crimes evidence must have " 'some threshold similarity to the crime charged' " in order to be admissible. *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). However, " 'mere general areas of similarity will suffice' to support admissibility" where the evidence is not offered under the *modus operandi* exception. *Id*. (quoting *Illgen*, 145 Ill. 2d at 372-73). Instead, some differences between the offenses will not defeat admissibility "because no two independent crimes are identical." *Id*. at 185 (citing *Illgen*, 145 Ill. 2d at 373). Other crimes evidence will be considered increasingly relevant or increasingly probative as the factual similarities across the cases increase. *Id*. at 184. Trial courts have

admitted other crimes evidence despite significant factual dissimilarities where it has been found that the prejudicial effect of the evidence does not substantially outweigh its probative value. See *Ross*, 395 Ill. App. 3d at 673-77.

¶ 47    In the case before us, the offenses against B.P. and R.G. were sufficiently similar under the balancing test. Both victims were young women–B.P. was 13 while R.G. was 21. Defendant approached both victims from behind. Both victims were threatened with perceived weapons where B.P. observed the handle of a handgun on defendant's waist and defendant pressed a hard, sharp object into R.G.'s back upon approach. Both victims were transferred by force to another location. Both victims were forced to perform oral sex on defendant before he penetrated each victim anally and vaginally. Both victims reported having some form of prior knowledge of defendant where B.P. stated that she noticed defendant observing her school on at least two occasions and R.G. stated that defendant called her phone a number of times. These similarities across the offenses are enough to qualify as "general areas of similarity." See *Donoho*, 204 Ill. 2d at 184. Moreover, the dissimilarities between the offenses were not enough to disqualify the evidence.

¶ 48    In sum, we find the trial court did not abuse its discretion when weighing the prejudicial impact and the probative value of the other crime evidence.

¶ 49                    II. Right Against Self-Incrimination

¶ 50    Defendant next contends the trial court erred in allowing the State to cross-examine him regarding the events that occurred with R.G. in violation of his fifth amendment right against self-incrimination. Specifically, defendant contends that his right against self-incrimination was violated where he was forced to answer questions beyond the scope of his direct examination concerning a separate, pending sexual assault case involving a different complainant.

¶ 51    The Illinois Constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself." Ill. Const. 1970, art. I, § 10. The immunity against self-incrimination, however, may be waived by a defendant who wishes to testify as a witness. *People v. Parchman*, 302 Ill. App. 3d 627, 635 (1998) (citing *Brown v. United States*, 356 U.S. 148, 156 (1958)). Once the privilege has been waived, a defendant becomes subject to cross-examination in the same manner as any other witness. *People v. Figueroa*, 308 Ill. App. 3d 93, 99 (1999).

¶ 52    Generally, cross-examination is limited to matters raised during direct examination. *People v. Enis*, 139 Ill. 2d 264, 295 (1990). However, "it is proper to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy that witness' direct testimony, even though they may incidentally constitute new matter which aids the cross-examiner's case." *Id*. (citing *People v. Williams*, 66 Ill. 2d 478, 486 (1977)). It is within the discretion of the trial court to determine the latitude afforded on cross-examination and that decision will not be reversed absent an abuse of discretion. *Id*. Subject to the trial court's discretion, "the prosecution is entitled and obligated to use all of the impeaching evidence it possesses in order to impact the credibility of the defendant if he chooses to testify." *People v. Jackson*, 391 Ill. App. 3d 11, 33 (2009).

¶ 53    In the case before us, we recognize that defendant did not testify about R.G. on direct examination. Our research has not revealed any case law with the same fact pattern as this case, *i.e.*, where a defendant's privilege against self-incrimination was raised at the trial level and the court allowed the State to cross-examine the defendant regarding prior crimes for which the door was not "opened" on cross-examination. *Cf. People v. Sutton*, 316 Ill. App. 3d 874, 892 (2000) (where, on direct examination, the defendant "opened the door" by testifying that the victim moved out of his home due to arguments and the fact that he was selling drugs without mentioning the domestic violence that occurred three months prior to the victim's death, and the trial court found the omission relevant and admissible on cross-examination to discredit his testimony). However, a defendant's waiver of the privilege against self incrimination "is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." *People v. Dawson*, 57 Ill. App. 3d 712, 715 (1978). In other words, once a defendant chooses to take the stand, he may not present a defense and then limit the State's ability to impeach that testimony by avoiding relevant impeachment evidence during his direct. See *People v. Peebles*, 120 Ill. App. 3d 376, 381 (1983) ("[i]t is well established that a defendant who takes the stand in his own behalf, is not entitled to claim the privilege against self-incrimination on cross-examination on matters reasonably related to the subject matter of his direct examination").

¶ 54    Here, defendant testified that the sexual encounter with B.P. was consensual. In fact, defendant alleged that B.P. pursued him and requested the sexual activity. Therefore, cross-examining defendant regarding the offense related to R.G. was relevant and admissible to "explain, qualify, discredit or destroy" defendant's version of the events. See *Enis*, 139 Ill. 2d at 295. We find support in case law holding that, in criminal sexual assault cases, other crimes evidence is admissible to challenge a consent defense. *Boyd*, 366 Ill. App. 3d at 93. "Once that threshold of similarity [between the charged crime and the other crime] has been met, courts have found other crimes evidence relevant in a sexual assault prosecution to prove defendant's criminal intent or lack of an innocent frame of mind." *People v. Luczak*, 306 Ill. App. 3d 319, 324 (1999). In *People v. Johnson*, 239 Ill. App. 3d 1064 (1992), the trial court found that evidence of a prior sexual assault was admissible to demonstrate the defendant's state of mind and to challenge the theory of defense that the victim consented to the sexual offense on trial. *Id*. at 1075; see also *People v. Harris*, 297 Ill. App. 3d 1073, 1086 (1998). We have established that evidence of the R.G. offense was admissible pursuant to the section 115-7.3(c) balancing test in terms of proximity in time between the offenses and the similarity between the offenses. We find that the cross-examination of defendant about the R.G. offense was proper to challenge, discredit, and impeach defendant's claim of a consensual sexual encounter with B.P.

¶ 55    In sum, we conclude the trial court did not violate defendant's fifth amendment right in allowing cross-examination regarding the R.G. offense because it properly discredited defendant's testimony, was probative of his intent and motive, and impeached his claim of consent.

¶ 56                                         CONCLUSION

¶ 57        We affirm the judgment of the trial court where we find no abuse of discretion in allowing the admission of defendant's other crimes evidence or the cross-examination of defendant regarding that evidence.

¶ 58        Affirmed.