THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY E. WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 1—99—4033

Opinion filed August 5, 2002.

Michael J. Pelletier and Kathleen M. Flynn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Joan F. Frazier, and Kathyrn M. Morrissey, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COHEN delivered the opinion of the court:
Following a jury trial in the circuit court of Cook County, defendant Anthony E. Williams was found guilty of attempt (first degree murder) (720 ILCS 5/8—4 (West 1992)) and aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1992)). Defendant was sentenced to 29 years' imprisonment.[1] On appeal, defendant does not challenge the sufficiency of the evidence supporting his conviction, but only alleges that prejudicial errors deprived him of a fair and impartial trial. Specifically, defendant argues that he was denied a fair trial because: (1) the State attempted to impeach defendant during cross-examination, without later perfecting the impeachment by presenting evidence to substantiate the State's claims; and (2) the State subsequently based improper arguments during its closing rebuttal argument on the unperfected impeachment.

Because we find that the State conducted improper cross-examination and made improper and prejudicial remarks during its rebuttal argument, we reverse defendant's convictions and remand this cause for a new trial. As these two issues are dispositive, we need not address the additional arguments defendant raises on appeal.

## BACKGROUND

The evidence introduced at trial revealed that defendant and the

---

[1]The trial court merged defendant's conviction for aggravated battery with a firearm into the attempt (first degree murder) conviction and sentenced defendant on the attempt (first degree murder) conviction only.

victim, Sheila Robinson, had a brief sexual relationship in the fall of 1992. Defendant and Sheila each presented conflicting accounts of the events surrounding their brief affair. Both testified, however, that in February of 1993, Sheila informed defendant that she was pregnant. Defendant denied that the child was his and subsequently cut off all communication with Sheila.

After Sheila gave birth to baby boy Rakeem, she filed suit against defendant both to establish paternity and to obtain child support. Between 1993 and 1996, Sheila and defendant saw each other only during court proceedings. Defendant and Sheila exhibited no hostility toward one another, nor did they speak directly to one another while in court. The paternity action remained pending in April of 1996.

Sheila testified that she had been employed as a mail carrier for approximately two years prior to the incident in question. On April 22, 1996, at approximately 2:30 p.m., she was delivering mail on foot in the vicinity of 87th Street and Winchester Avenue in Chicago, Illinois. As Sheila was returning to her car, she noticed a man she recognized as defendant leaning up against a building in an alley. The alley was north of where she had parked her car. Defendant was dressed in dark pants, a dark long-sleeved shirt and had his "dreadlocks" pulled up in a Rastafarian-type knit cap. Defendant emerged from the alley pointing a gun at Sheila. According to Sheila, defendant then stated "this is for you" and began firing the gun. Sheila suffered gunshot wounds to her right wrist, right chest, left thigh, left arm and left shoulder. None of her injuries proved fatal.

The State also presented the testimony of two eyewitnesses. Kristen Carter testified that at the time of the shooting he lived at 8724 South Winchester Avenue in a house located on the west side of the street. While standing near the front door of his house, Kristen heard five gunshots. After hearing the gunshots, Kristen testified that he slowly opened his front door approximately 14 inches to "see what was going on." Kristen looked across the street and observed Sheila falling to the ground. Kristen recognized Sheila as his neighborhood mail carrier. Kristen testified that he also observed a light-skinned male with "dreadlocks," whom he later identified as defendant, standing a few feet away from Sheila. According to Kristen, defendant was holding a dark object which Kristen believed to be a gun. Defendant then crossed Winchester and began walking toward 87th Street. When defendant reached the corner of 87th Street and Winchester Avenue he crossed the street. Kristen then lost sight of him, but a few seconds later Kristen observed a white Cadillac traveling at a rapid speed eastbound on 87th Street.

Edward Stevens, an electrician, testified that he was remodeling a

basement on Winchester Avenue at the time of the shooting. Edward's truck was parked on the east side of Winchester Avenue near a vacant lot approximately 50 feet from an alley. Edward was getting into his truck when he heard someone shout. While looking through his rear-view mirror, Edward observed a man, whom he later identified as defendant, shoot a "mail lady" between five and six times. Edward testified that defendant was wearing a dark black leather jacket, jeans and had "dreadlocks." After the shooting, Edward observed defendant place a pistol into his jacket and walk across Winchester Avenue toward 87th Street. Defendant then turned the corner and walked south on 87th Street. Edward also testified that he later observed defendant driving a white Cadillac eastbound on 87th Street.

Testifying on his own behalf, defendant stated that on the date of the offense he was employed as a Chicago Transit Authority (CTA) bus driver. On April 22, 1996, defendant had the day off. Defendant testified that he awoke around 10:30 a.m. and drove his red Oldsmobile to the CTA garage located at 39th Street and Archer Avenue to "pick vacation days." Defendant admitted that he owned a white Cadillac, but claimed that it was at a car dealership that day because he was trying to sell it. Defendant testified that he arrived at the CTA garage around 11:30 a.m. and began looking for his union steward, Chester Robinson. Defendant was informed that Robinson was out of the office and would not be returning until 3 p.m. Defendant then made a stop at the car dealership located at 1122 West Foster Avenue to inquire about the status of his white Cadillac. Defendant and a friend, Thelma Mitchell, then drove to defendant's brother's apartment located at 61st Street and Stony Island Avenue. According to defendant, he stayed at his brother's apartment until 2:15 p.m. when he returned to the CTA garage to speak to Robinson. Robinson was still out of the office, so defendant waited to speak to his superintendent, Mr. Harrington. Defendant testified that he spoke to Mr. Harrington around 3:15 p.m., left the CTA garage at 3:30 p.m. and then returned to his apartment located at 5101 Sheridan Road.

On cross-examination, the State asked defendant a number of questions relating to Rakeem's birth and Sheila's paternity action. Defendant denied being angry that Sheila was pregnant and denied that he was avoiding responsibility for paying child support. The State inquired whether defendant knew that paternity tests established that he was indeed Rakeem's father. Defendant admitted to taking blood tests, but denied knowing how many tests he took or the results of those tests. The State further inquired whether defendant knew that there was an upcoming court hearing on May 15, 1996, to "establish paternity and set up child support." Defendant adamantly denied knowing that there was a hearing set for May 15, 1996.

The State called Detective Andrew Abbott as a rebuttal witness. Detective Abbott interviewed defendant postarrest both at defendant's apartment and at the police station. Detective Abbott testified that at defendant's apartment, defendant told him that defendant knew Sheila from a "former love affair" and that Sheila had accused defendant of fathering her child. Defendant also told Detective Abbott that defendant and Sheila had been involved in a lengthy court battle over child support payments.

Detective Abbott further testified that at the police station defendant admitted that he had encouraged Sheila to have an abortion and that he was angry that Sheila continued to pursue him for money. Defendant also told Detective Abbott that he felt Sheila was trying to "blackmail" him. Detective Abbott testified that defendant further admitted that he had hired an individual who resembled defendant to "beat up" Sheila in retaliation for this alleged "blackmail."

After closing arguments, the jury found defendant guilty of attempt (first degree murder) (720 ILCS 5/8—4 (West 1992)) and aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1992)). Defendant was subsequently sentenced to 29 years' imprisonment. This appeal followed.

## ANALYSIS

Defendant argues that the State's cross-examination of him and subsequent closing denied defendant a fair trial. Specifically, defendant points to the State's questions which assumed as fact that the blood tests substantiated defendant as Rakeem's father and further implied that defendant knew that at an upcoming paternity hearing those blood tests would reveal that defendant was, in fact, Rakeem's father. Defendant argues that the State failed to present *any* evidence substantiating these claims, although presenting them as conclusive—while failing to perfect the impeachment. Defendant further contends that the State argued to the jury during its closing rebuttal argument that defendant shot Sheila because he knew he was going to be declared Rakeem's father at the upcoming court hearing and wanted to avoid paying child support. Defendant asserts that both instances served to impute to defendant a motive that was neither proven nor supported by the record.

The State responds that it substantiated its questioning during defendant's cross-examination through the rebuttal testimony of Detective Andrew Abbott. The State also asserts that its rebuttal argument was properly "based on the evidence presented and the reasonable inferences arising therefrom." Furthermore, the State asserts that defendant waived these issues because he failed either to object at trial or to raise the objection in his posttrial motion.

Defendant concedes that he only objected to some of the prosecutor's cross-examination questions at trial and failed to raise a proper objection in his posttrial motion. Nevertheless, defendant asks this court to review the issues as plain error. Defendant claims that the plain error exception applies to his case because the State's improper cross-examination questioning and rebuttal argument deprived him of a fair trial.

■ "The plain error doctrine (134 Ill. 2d R. 615(a)) may be applied where the evidence is closely balanced *or* where the error is of such magnitude that it denied the accused a fair trial." (Emphasis added.) *People v. Tisdel*, 316 Ill. App. 3d 1143, 1153 (2000). While defendant does not assert that the evidence in this case was closely balanced, plain error can be found in either instance. *People v. Nelson*, 193 Ill. 2d 216, 222 (2000). "Plain error marked by 'fundamental [un]fairness' occurs only in situations which 'reveal breakdowns in the adversary system,' as distinguished from 'typical trial mistakes.' [Citation.]" *People v. Keene*, 169 Ill. 2d 1, 17 (1995). For this court to review an issue under the plain error doctrine, "the asserted error must be something 'fundamental to the integrity of the judicial process.' [Citation.]" *Keene*, 169 Ill. 2d at 17.

■ Initially, we note that upon analysis the evidence in this case, while not overwhelming, cannot be considered closely balanced. Therefore, we need not consider the assigned errors under this prong of the plain error analysis. Turning to the second prong, however, we find that the State's unsubstantiated cross-examination of defendant and subsequent improper rebuttal argument to the jury categorically stating that paternity testing had determined defendant to be Rakeem's father created a situation so fundamentally unfair and of such a magnitude as to deny defendant a fair trial. See *People v. Vargas*, 174 Ill. 2d 355, 363 (1996) (finding the evidence in case not closely balanced, but reviewing the alleged issue of error anyway under the second prong of the plain error rule); *People v. Coleman*, 158 Ill. 2d 319, 333-34 (1994) (finding same). Because defendant has satisfied the second prong of the plain error rule, we address defendant's arguments on the merits.

At trial, the State's theory was that defendant knew that he was going to be declared the father of Rakeem and ordered to pay child support at a May 15, 1996, court proceeding. The State surmised that defendant shot and attempted to kill Sheila because he did not want to pay child support. In support of this theory, the State, on cross-examination, asked defendant a number of questions relating to the paternity action. Defendant was cross-examined as follows:

"Q. Now, getting back to this paternity suit, there were blood tests that were done, is that correct?

A. Yes.

Q. As a matter of fact, three different blood tests were done right?

A. I'm not sure.

Q. And the blood tests showed 99 point 9 percent that you were the father, right?

A. I'm not really sure.

Q. You knew that the results came back that you were the father, right?

A. They said the results came back, but I never—you know, I never was really into it.

Q. You knew there was a hearing scheduled for May 15 of 1996 to establish paternity and set up child support, right?

A. We were going back and forth to court, you know, just going back and forth to court for three, four years.

Q. You knew the next court date that you had from April 17 of 1996 was set for May 15 of 1996, right?

A. No, I did not."

■ While it is proper on cross-examination to develop all circumstances within a witness's knowledge that tend to explain, qualify, discredit or destroy the witness's direct testimony (*People v. Williams*, 66 Ill. 2d 478, 486 (1977)), it is improper on cross-examination to ask a witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. *People v. Enis*, 139 Ill. 2d 264, 297 (1990). " 'The asking of the leading question and the denial carry a harmful innuendo which is unsupported by any evidence.' [Citation.]" *Enis*, 139 Ill. 2d at 297. "The danger inherent in such questioning is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question." *Enis*, 139 Ill. 2d at 297, citing *People v. Nuccio*, 43 Ill. 2d 375, 381 (1969).

■ The State admits that it failed to place the results of the blood tests into evidence but argues that it properly substantiated its cross-examination of defendant through the rebuttal testimony of Detective Abbott. Detective Abbott's rebuttal testimony, however, did not establish that defendant *knew* that there was a hearing scheduled for May 15, 1996, to establish paternity and order defendant to pay child support. Nor did the rebuttal testimony establish that a paternity test declaring defendant "99 point 9 percent" likely to be Rakeem's father even existed, let alone whether defendant *knew* of such test results. In fact, most of Detective Abbott's rebuttal testimony reiterated what the jury had already heard through the direct testimony of Sheila and defendant—that defendant and Sheila had a brief sexual relationship, that Sheila had accused defendant of fathering her child (which accusation defendant denied) and that Sheila and defendant had been

involved in a lengthy court battle over paternity and child support payments.

Furthermore, Detective Abbott's testimony concerning defendant's statement that defendant felt Sheila was trying to "blackmail" him was similarly ineffective in perfecting the State's attempted impeachment of defendant. If anything, that testimony served to bolster defendant's argument that the State's cross-examination of him was improper. Read in context, defendant's purported statements to Detective Abbott with respect to "blackmail" reinforce defendant's answers to the State's cross-examination questioning and defendant's repeated denials of paternity.

The State also argues that the overwhelming evidence of defendant's guilt presented at trial negates any need for this court to reverse his conviction. *People v. Baker*, 127 Ill. App. 3d 565, 570 (1984). The State attempts to persuade this court that any error in its cross-examination of defendant was harmless in light of the overwhelming evidence of defendant's guilt. In this case, however, we cannot conclude that the State's improper line of questioning on cross-examination was harmless. Defendant was the only witness to testify on his behalf at trial. The State's unsubstantiated cross-examination destroyed defendant's credibility before the jury. The State's leading questions concerning paternity test results and hearing dates imputed to defendant a motive that was unsupported by any evidence. The State attempted to properly substantiate its impeachment through the rebuttal testimony of Detective Abbott, but fell short. As discussed below, this error was then compounded through the State's use of the unperfected impeachment in its rebuttal argument.

We cannot in good conscience ignore the State's shortcomings. Illinois courts have consistently held the type of unperfected cross-examination utilized in this case constitutes reversible error (see *People v. Enis*, 139 Ill. 2d 264 (1990); *People v. Rivera*, 145 Ill. App. 3d 609 (1986); *People v. Beringer*, 151 Ill. App. 3d 558 (1987); *People v. Braggs*, 184 Ill. App. 3d 756 (1989)). We are unpersuaded by the State's tortured attempts to distinguish these cases on the facts. It is the reasoning behind these decisions that compels our decision in this case.

Defendant was yet further prejudiced by the State's use of the unperfected impeachment during its rebuttal argument:

"Is it a coincidence that the next court date for this defendant was on May 15 of 1996 and this defendant's day off that he went to get on May—on April 22 when he was at his work, his next day off that he went to get was May 15, 1996? He knew what was going to happen that day. He was going to be found legally in a court of law

to be the father of Rakeem, and he was going to be ordered to pay child support.

[DEFENSE COUNSEL]: Objection.

THE COURT: That will be sustained. It goes far beyond the implications that happened on that court date.

[PROSECUTOR]: This defendant knew what was going to happen in court. He knew that there was going to be a court date to establish his paternity, but he didn't want that to happen.

\* \* \*

Ladies and gentleman, it all boils down to one thing. This defendant is running from his responsibility of paying support for a child. He is a—

[DEFENSE COUNSEL]: Objection. That's not the issue.

THE COURT: That's a fair comment on the evidence.

[PROSECUTOR]: This defendant is running from his responsibility. He is a deadbeat dad. That's exactly what this defendant is. And you know what, ladies and gentlemen?

He wanted to avoid that responsibility by killing Sheila Robinson and leaving their child an orphan, leaving their child with no mother, just so he wouldn't have to pay child support. That's what kind of person Anthony Williams is.

Ladies and gentlemen, he tried.

[DEFENSE COUNSEL]: Objection again to this line of argument.

THE COURT: The objection is overruled its [sic] fair comment.

[PROSECUTOR]: This defendant tried to avoid responsibility on April 22, 1996, just like he's trying to avoid responsibility today. Tell [defendant] his time is running and avoiding responsibility is over. Tell him it's time to grow up. Tell him that he needs to take responsibility for his actions. Don't buy all of these stories that this defendant is trying to feed you. Find this defendant guilty."

The State asserts that the comments above were properly drawn inferences from the evidence adduced at trial. According to the State, the following evidence supports its argument: (1) Michael Carroll, a United States Postal Inspector who investigated the shooting of Sheila Robinson, testified that defendant had told him that on the day of the offense defendant had gone to his place of employment to "pick a vacation day" and the date defendant picked was May 15, 1996; (2) Sheila testified that there was a hearing scheduled for May 1996 to establish paternity and order defendant to pay child support; and (3) Detective Abbott testified that defendant was "angry over being asked for support money" and had hired an individual to "beat" Sheila. According to the State, from this evidence "it is entirely reasonable that an inference could be drawn that the defendant had on his mind on

April 22, 1996, for [*sic*] a hearing to determine the paternity of Rakeem Robinson, and to be ordered to pay child support."

The inherent fallacy of this argument is obvious. None of the evidence mentioned above establishes that defendant on April 22, 1996, *knew* the results of the paternity tests and also *knew* that at a court hearing on May 15, 1996, he was going to be declared Rakeem's father and ordered to pay child support. Sheila's testimony that a hearing date was set for May 1996 to establish paternity and order child support established only that there was, in fact, a future court date set in the paternity action. Inspector Carroll's testimony that defendant had selected May 15, 1996, as his day off establishes only that defendant most likely knew he had to be in court that day, but it does not establish defendant's knowledge of the subject matter of the hearing. Finally, Detective Abbott's testimony established only that: (1) Sheila had been pursuing defendant for money; (2) defendant felt that this pursuit amounted to "blackmail"; (3) Sheila's actions angered defendant; and (4) as a result defendant had hired an unidentified individual to "beat" Sheila in exchange for $100.

■ The State further argues that if it committed any error, the error was cured when the trial court sustained defense counsel's objection. During the State's rebuttal argument the prosecutor stated: "[Defendant] knew what was going to happen on that day. He was going to be found legally in a court of law to be the father of Rakeem, and he was going to be ordered to pay child support." An objection was sustained, but the prosecutor continued, stating: "This defendant knew what was going to happen in court. He knew that there was going to be a court date to establish his paternity, but he didn't want that to happen." Indeed, while it is true that the trial court sustained defense counsel's objection to the prosecutors' improper argument, the record reveals that the State nevertheless chose to continue the same line of improper argument.

It is improper for a prosecutor to persist in improper argument after receiving an adverse ruling by the trial court. *People v. Weinstein*, 35 Ill. 2d 467, 471 (1966). "Such persistence eliminates the salutary effect of the court's ruling in sustaining objections to the argument." *Weinstein*, 35 Ill. 2d at 471. As our supreme court so aptly stated, "[d]riving a nail into a board and then pulling the nail out does not remove the hole." *People v. Cepek*, 357 Ill. 560, 570 (1934). Here, the prosecution's continued improper argument after the trial court had sustained defendant's objection served to magnify the prejudice to defendant by highlighting to the jury the State's unsubstantiated theory that defendant had attempted to kill Sheila as a way to avoid paying child support.

We find similarly unpersuasive the State's argument that any prejudice to defendant was cured by a jury instruction advising the jury that closing arguments are not evidence and any statement made by one of the attorneys not based on the evidence should be ignored. "Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by introduction of such evidence. Whether the remarks and/or evidence constitute error depends, in each case, on the nature and extent of the statements and whether they are probative of defendant's guilt." *People v. Blue*, 189 Ill. 2d 99, 132 (2000). In light of the analysis above, we find that the jury instruction did little to cure the damage already inflicted by the State. *Blue*, 189 Ill. 2d at 132.

"While the prosecutor is allowed wide latitude in closing argument, the comments must be based on evidence admitted at trial or on any reasonable inferences therefrom." *People v. Roman*, 323 Ill. App. 3d 988, 999 (2001). "A 'fact not based upon evidence in the case may not properly be argued to the jury ***.' " *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982), quoting *People v. Beier*, 29 Ill. 2d 511, 517 (1963). "The test in determining whether remarks of the prosecutor during closing argument constitute reversible error is whether the comments were such that if not made the jury might have reached a different result." *People v. Baker*, 127 Ill. App. 3d 565, 571 (1984). "In determining whether the requisite substantial prejudice exists, the court must consider the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *People v. Shief*, 312 Ill. App. 3d 673, 680 (2000).

In the case at bar, the State used unsupported cross-examination questioning to argue to the jury that defendant shot Sheila because he knew he was going to be declared Rakeem's father at an upcoming court hearing and wanted to avoid paying child support. We cannot presume that the State's improper argument, imputing to defendant a motive, did not affect the jury's verdict. "Doubt as to its harmful effect must be resolved in favor of the defendant." *People v. Weinstein*, 35 Ill. 2d 467, 471-72 (1966).

## CONCLUSION

The State erred both in attempting to impeach defendant with unsupported cross-examination questioning and in using the unsupported cross-examination during its rebuttal argument to argue defendant's guilt to the jury. We cannot conclude that the State's conduct in this case was harmless. The persistent use of the paternity test results to buttress the unsupported theory that defendant shot the victim, Sheila Robinson, because he knew he was going to be

declared Rakeem's father at an upcoming court hearing and wanted to avoid paying child support may have mistakenly led the jury to convict defendant on considerations other than the evidence alone.

We need not address the remaining issues defendant has raised on appeal. Because there was sufficient evidence in the record to support the defendant's conviction (*People v. Taylor*, 76 Ill. 2d 289, 309 (1979)), defendant's convictions are reversed and the cause remanded to the circuit court of Cook County for a new trial.

Reversed and remanded.

McNULTY and COUSINS, JJ., concur.