NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241046-U

NO. 4-24-1046

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Carroll County |
| JEFFREY L. SCHMIDT, | ) | No. 20CF121 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John J. Kane, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The issue of impeachment by unsubstantiated insinuation has been
procedurally forfeited, and the doctrine of plain error does not avert the forfeiture.

(2) Whether to object is a matter of trial strategy, and because defense counsel
subjected the State's case to meaningful adversarial testing, his choice not to
object to certain asserted trial errors cannot support a claim of ineffective
assistance of counsel.

¶ 2    In the Carroll County circuit court, a jury found defendant, Jeffrey L. Schmidt,

guilty of unlawful possession of methamphetamine (less than five grams) (see 720 ILCS

646/60(b)(1) (West 2020)), and the court sentenced him to probation and jail time.

¶ 3    Defendant appeals on two grounds.

¶ 4    First, defendant contends he is entitled to a new trial because the prosecutor

attempted to impeach a defense witness, Andrea Preston, by insinuating that, in claiming

ownership of the methamphetamine at issue, she had knowledge that she was protected by an

expired statute of limitations. After Preston denied having such knowledge, the prosecutor did not follow up with rebuttal evidence that she in fact had such knowledge. Consequently, on appeal, defendant complains of unsubstantiated impeachment or, in other words, unfair impeachment by insinuation. We conclude, however, that this contention has been procedurally forfeited and that the doctrine of plain error, invoked by defendant, does not avert the forfeiture.

¶ 5          Second, defendant contends he is entitled to a new trial because defense counsel's allegedly substandard performance resulted in the jury's being exposed to the unsubstantiated impeachment and to evidence implicating defendant in other controlled substance crimes—*i.e.*, possession of three pills—with which he had not been charged in the present case. The allegedly substandard performance was essentially the failure to object. Whether to object is a matter of trial strategy, and mistakes in trial strategy cannot support a claim of ineffective assistance unless defense counsel entirely failed to conduct any meaningful adversarial testing. Defense counsel subjected the State's case to meaningful adversarial testing, most notably by calling Preston and eliciting from her the admission that the methamphetamine that defendant was charged with possessing belonged to her rather than to him. It follows, from case law, that the purported mistakes in trial strategy are immune to a claim of ineffective assistance.

¶ 6          Therefore, we affirm the circuit court's judgment.

¶ 7                                    I. BACKGROUND

¶ 8          The jury trial was held on April 30, 2024. The evidence at trial was essentially as follows.

¶ 9          On October 14, 2020, Matthew Herpstreith, a deputy sheriff with the Carroll County Sheriff's Office, was called to defendant's residence in response to a report of a domestic disturbance. Upon arrival, Herpstreith spoke with Preston, who, by his understanding, lived at

the residence occasionally. Other police officers spoke with defendant outside the residence.

¶ 10 While speaking with Preston, Herpstreith noticed, on the kitchen counter, a white powdery substance. Suspecting that the substance was methamphetamine, he performed a field test on it. Although Herpstreith implied, in his testimony, that the result of the field test was positive, it does not appear that, at the jury trial, any explicit proof was presented of its positivity. Preston told Herpstreith that defendant had smoked methamphetamine in a bong and that defendant afterward took the bong outside and hid it.

¶ 11 Without making any arrest yet, Herpstreith returned to the Carroll County Sheriff's Office and prepared a request for a search warrant. He obtained the search warrant, and early the next morning, the police executed it. During the search, defendant was the only person present at the residence. The police found a glass bong on the kitchen counter and a glass pipe in a toolbox in a locked shed outside the residence. Because both the bong and the pipe contained a white powdery residue, the police seized both items. No chemical testing was performed on the residue in the bong, but chemical testing revealed that the residue in the pipe contained methamphetamine.

¶ 12 Additionally, in the shed, the police found three pills that appeared to be prescription medication. One of the pills was inside cellophane from a cigarette pack, and the other two pills, along with several fragments of pills, were inside a Ziploc bag. One of the pills was tramadol hydrochloride, and the remaining two full pills and pill fragments were alprazolam.

¶ 13 The police arrested defendant for narcotics offenses and took him to jail, where he signed a *Miranda* waiver form (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and made a statement to Herpstreith and a police lieutenant for Savanna, Illinois, Dan Nevills. Defendant declined to consent to the interview's being recorded. Herpstreith and Nevills testified that

defendant told them, in the interview, that he was a user of methamphetamine and that the bong belonged to him but that the pills were not his. On the other hand, according to defendant's testimony at trial, he told the police he did not use methamphetamine, "the stuff" and the pipe were not his, Preston "had a problem" with methamphetamine, and the bong belonged to her.

¶ 14　　　　In the present case, the State charged defendant with unlawful possession of methamphetamine (less than five grams) (see 720 ILCS 646/60(b)(1) (West 2020)). In two separate criminal cases, Carroll County case Nos. 20-CF-122 and 20-CF-123, the State charged defendant with unlawful possession of a controlled substance in the form of pills, but the State later dismissed those pill cases. Even so, at the jury trial in the present case, the pills were referred to repeatedly.

¶ 15　　　　Preston testified for the defense. She acknowledged that, since about 2018, she had been a methamphetamine addict and that, having pleaded guilty in 2021 to unlawful possession of methamphetamine, she was "residing in the Carroll County Jail downstairs" for that offense. She recounted that she had been living with defendant, in his residence, for about two and a half years when, on October 14, 2020, they got into an argument that became so heated that she moved out that same night. When defense counsel presented her with a photograph of the pipe the police had seized from the shed, the following colloquy occurred:

> "Q. I show you a document that's been marked State's Exhibit 2. There's a glass pipe in there; you can kind of see it. Would you examine that and see if— you're familiar with that pipe?
>
> A. Yes, sir, I am.
>
> Q. Is that your pipe?
>
> A. Yes, sir, it was.

Q. Did you bring that into the residence where you were living with [defendant]?

A. Yes, sir.

Q. Did you regularly take meth when you were living at that residence?

A. Not all the time, no. But, on occasion, I had.

* * *

Q. Any meth on the property would have been yours?

A. To my knowledge, yes, sir.

Q. Just to the best of your knowledge?

A. Yes."

¶ 16 On cross-examination, the prosecutor and Preston had the following exchange regarding what she told the police when they responded to the report of the domestic disturbance:

"Q. When you spoke with Deputy Herpstreith, in fact, you told Deputy Herpstreith that [defendant] was the one doing methamphetamine earlier in that day, correct?

A. Yes.

* * *

Q. And, in fact, you told Deputy Herpstreith as well that [defendant] had hid a bong prior to Deputy Herpstreith's arrival, correct?

A. Yes.

* * *

Q. And is it also true that you told Deputy Herpstreith that you would

contact him when [defendant] got back into town that night?

A. I don't recall saying that either.

Q. But you were talking with Deputy Herpstreith—

A. I had just been a victim of domestic violence at that point, so I was confused, I was upset. I don't recall what was said."

¶ 17     The prosecutor further asked Preston, on cross-examination, if she was aware of the expiration of the statute of limitations. The following reflects that exchange:

"Q. You were never arrested on October 14th of 2020, correct?

A. No, sir.

Q. Ms. Preston, it's true that you know the statute of limitations in Illinois is three years, correct?

A. I do not know the statute of limitations.

Q. And so in saying that the pipe belonged to you, you believe you can't be prosecuted for having possession of the pipe and saying it's yours?

A. I did not even know that."

¶ 18     On redirect examination, Preston explained that when speaking with Herpstreith on October 14, 2020, she was "very mad at" defendant and that she "might have said things to the police to get him in trouble"—things she now "regret[ted] having said." She claimed that her testimony at trial was the truth and that "some of what [she had] said to the detective in a fit of anger may not have been accurate."

¶ 19     In rebuttal, the State called Herpstreith, who testified that, on October 14, 2020, Preston told him that (1) defendant "was using the bong prior to the domestic situation" and "had taken it outside and hit it" before the police arrived, (2) defendant "would be going to Clinton,

Iowa, that night to pick up more methamphetamine," and (3) Preston "agreed to get in contact with [Herpstreith] to let [the police] know he was back with it." According to Herpstreith's rebuttal testimony, Preston never told him, on October 14, 2020, that any of the methamphetamine belonged to her.

¶ 20 Also, in its case in rebuttal, the State called Nevills, who testified that, after Herpstreith arrested defendant, he heard Herpstreith ask defendant about the methamphetamine that had been found in the residence and that defendant answered he was a user of methamphetamine and that the bong was his.

¶ 21 In his rebuttal closing argument, the prosecutor implied that Preston's taking responsibility for the methamphetamine was a falsehood motivated by the expiration of the statute of limitations: "She wanted to take responsibility for it today. *** [O]ver three years after the incident occurred, beyond the statute of limitations. How convenient."

¶ 22 The jury found defendant guilty of the charged offense of unlawful possession of methamphetamine (less than five grams).

¶ 23 Defendant's posttrial motion raised only two issues: (1) the asserted error of allowing defendant to be impeached with a prior felony conviction and (2) a *Brady* claim (see *Brady v. Maryland*, 373 U.S. 83 (1963)) arising from a midtrial revelation that one of the evidence managers at the Carroll County Sheriff's Office was a volunteer instead of a paid employee.

¶ 24 On July 15, 2024, the circuit court held a hearing on the posttrial motion. The volunteer evidence manager testified at the hearing, and the court denied the posttrial motion.

¶ 25 The circuit court then convened a sentencing hearing, at the conclusion of which the court sentenced defendant to probation for 24 months, incarceration in the Carroll County jail

for 60 days, and various financial assessments.

¶ 26        On August 1, 2024, defendant filed his notice of appeal.

¶ 27                        II. ANALYSIS

¶ 28                    A. Unsubstantiated Impeachment

¶ 29        It appears to be undisputed that a prosecution for unlawful possession of methamphetamine (see 720 ILCS 646/60(b)(1) (West 2020)) "must be commenced within 3 years after the commission of the offense" (720 ILCS 5/3-5(b) (West 2020)). In his cross-examination of Preston and in his rebuttal closing argument, the prosecutor suggested that the expiration of this three-year statute of limitations enabled Preston, without fear of being prosecuted herself for unlawful possession of methamphetamine, to testify falsely that it was she, rather than defendant, who possessed the methamphetamine that the police found at defendant's residence. By that line of attack, the prosecutor impeached Preston or "call[ed] in question [her] veracity." (Internal quotation marks omitted.) *McWethy v. Lee*, 1 Ill. App. 3d 80, 84 (1971).

¶ 30        Defendant argues he is entitled to a new trial because the prosecutor "insinuat[ed] that [Preston] had knowledge of the statute of limitations but failed to perfect impeachment by presenting evidence that she had any such knowledge." It does not appear, however, that defense counsel made this objection at trial. Nor did defense counsel raise this impeachment issue in his posttrial motion. Generally, to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), and a failure to take both of those preservative measures results in a procedural forfeiture of the issue (see *People v. Bannister*, 232 Ill. 2d 52, 65 (2008)).

¶ 31        Defendant seeks to avert a procedural forfeiture, however, by invoking the doctrine of plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under that doctrine, "we

review unpreserved plain errors affecting substantial rights in two limited circumstances: (1) when the evidence is closely balanced or (2) when the error was so serious that it denied the defendant a fair and impartial trial." *People v. Hutt*, 2023 IL 128170, ¶ 28. Defendant relies on the first prong of the plain error doctrine: he claims that "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 32 The first step in applying the plain error doctrine is to determine whether an error was made (*Hutt*, 2023 IL 128170, ¶ 29), and then, if we determine that an error was made, we can proceed to the further question of whether the error is "clear or obvious" (internal quotation marks omitted) (*Sebby*, 2017 IL 119445, ¶ 48). The error, according to defendant, was the prosecutor's failure to substantiate a factual representation that the prosecutor impliedly made in his impeachment of Preston. Defendant quotes *People v. Enis*, 139 Ill. 2d 264, 297 (1990), arguing: "[T]he state must not ask a defense witness any 'questions presuming facts not in evidence as a precursor to impeachment of that witness' in the absence of 'admissible evidence to substantiate the inquiry.' "

¶ 33 In *Enis*, the defendant was charged with the first degree murder of Melinda Entrata, the complainant in a criminal sexual assault case pending against him. *Id.* at 270-71. The State's theory in the murder case was that the defendant had murdered Entrata because of her accusations against him in the criminal sexual assault case. *Id.* at 290-91. The defendant took the stand in the murder case and testified, on direct examination, that his relationship with Entrata had been good and that the sexual encounter that she had characterized as a criminal sexual assault had in fact been consensual. *Id.* at 290. On cross-examination in the murder case, the

prosecutor asked the defendant questions that, in the way they were phrased, assumed certain facts regarding the alleged criminal sexual assault even though, in the murder case, the prosecutor had offered no evidence to substantiate those assumed facts. *Id.* at 296. For example, the prosecutor asked the defendant why, if the sexual encounter was consensual, Entrata had told a friend of hers that she had been raped by a man wearing a mask and gloves. *Id.* at 292. Also, the prosecutor asked the defendant why, if the defendant's relationship with Entrata had been good, she was "crying when she called her friend." *Id.* at 293.

¶ 34        In the present case, by contrast, the assumed facts were uncontroversial then and are uncontroversial now. There were the following questions and answers in the prosecutor's cross-examination of Preston:

"Q. Ms. Preston, it's true that you know the statute of limitations in Illinois is three years, correct?

A. I do not know the statute of limitations.

Q. And so in saying that the pipe belonged to you, you believe you can't be prosecuted for having possession of the pipe and saying it's yours?

A. I did not even know that."

The prosecutor's questions in that exchange contained only two assumed facts: (1) the statute of limitations in Illinois was three years, and (2) Preston said the pipe belonged to her. On appeal, defendant does not contend that either of those two facts needed substantiation. That Preston knew that the statute of limitations in Illinois was three years was not the assumed fact but, rather, was the question—to which Preston was free to answer yes or no. That the statute of limitations was, in fact, three years was the precursor to the question of whether she knew that the statute of limitations was three years. Likewise, that she believed that she could not be

prosecuted for possessing the pipe was not the assumed fact but, rather, was the question—to which, again, she was free to answer yes or no. The assumed fact, which was the precursor to that question, was that she said, on direct examination, that the pipe belonged to her. Defendant does not contend that either of those assumed facts—(1) and (2) above—needed substantiation. Instead, he contends that Preston's knowledge of the statute of limitations needed substantiation. But her knowledge was not the assumed fact (as, in *Enis*, the things that Entrata had supposedly told her friend were assumed facts). Instead, Preston's knowledge was the question. The question the prosecutor put to Preston was whether it was correct (or incorrect) that she had such knowledge. *Enis*, therefore, is inapposite.

¶ 35        A case that arguably provides more support for defendant's position—that the impeached witness's knowledge, which is the subject of the question, must be substantiated—is an appellate court case that he cites, *People v. Williams*, 333 Ill. App. 3d 204 (2002). In *Williams*, a jury found the defendant guilty of attempt (first degree murder) and aggravated battery (*id.* at 208) in that, on April 22, 1996, he shot Sheila Robinson (*id.* at 206). Several years before the shooting, the defendant and Robinson had a brief sexual relationship. *Id.* at 205-06. A child was born, and Robinson filed suit against the defendant to establish paternity and obtain child support. *Id.* at 206. In the criminal case, the State's theory was that the defendant had shot Robinson to avoid having to pay child support. See *id.* at 210. The defendant testified on his own behalf in the criminal case, recounting his activities on the day of the shooting. See *id.* at 206. Then, on cross-examination, the prosecutor asked him if, at the time of the shooting, he knew that (1) paternity testing had established that he was the father and (2) a hearing was set for May 15, 1996, " 'to establish paternity and set up child support.' " *Id.* at 210. The defendant denied knowing (1) and (2). See *id.* In the State's case in rebuttal, in which the only witness the State

called was a detective, Andrew Abbott (see *id.* at 208), the State failed to offer any evidence that the defendant had known (1) and (2). See *id.* at 211.

¶ 36    The appellate court observed in *Williams*:

"The State admits that it failed to place the results of the blood tests into evidence but argues that it properly substantiated its cross-examination of defendant through the rebuttal testimony of Detective Abbott. Detective Abbott's rebuttal testimony, however, did not establish that defendant *knew* that there was a hearing scheduled for May 15, 1996, to establish paternity and order defendant to pay child support. Nor did the rebuttal testimony establish that a paternity test declaring defendant '99 point 9 percent' likely to be [the child's] father even existed, let alone whether defendant *knew* of such test results." (Emphases in original.) *Id.* at 210.

¶ 37    To an extent, *Williams* is distinguishable from the present case. Whereas it was unproven, in *Williams*, that the positive results of the paternity tested "even existed" and that a hearing to present the positive results had been set (*id.*), there is no doubt, in the present case, that the statute of limitations existed (and was expired) and that, on direct examination, Preston claimed ownership of the pipe. The existence of an Illinois criminal statute and what a witness just got done saying on direct examination are not things that would have to be proven as the results of a paternity test would have to be proven. Everyone is presumed to know the law (*Jones v. Board of Education of City of Chicago*, 2013 IL App (1st) 122437, ¶ 22), and the jury presumably heard what a witness said on direct examination—but not everyone is presumed to know the results of a paternity test.

¶ 38    Even so, that difference would not altogether prevent a colorable comparison of

- 12 -

the present case to *Williams*, for the appellate court in *Williams* criticized the State not only for failing to prove the existence of the paternity test and the scheduling of the paternity hearing but also for failing to prove the defendant's knowledge of those presumed facts. See *Williams*, 333 Ill. App. 3d at 210. So, in the present case, defendant is in colorable territory when he argues that, correspondingly, the State was obligated to follow through with its impeachment of Preston by presenting evidence that she knew of the statute of limitations.

¶ 39　　　For two reasons, though, that argument is unpersuasive or at least debatable: first, because of the difference in accessibility between a statute of limitations and the results of a paternity test and, second, because defendant would have had more of an occasion and opportunity to become aware of the publicly accessible statute of limitations than the defendant in *Williams* would have had to become aware of the results of a paternity test that were in the possession of the adverse party.

¶ 40　　　To avoid judging the prosecutor too harshly in this case and unduly restricting cross-examination, we should keep in mind that another person's awareness is never susceptible to direct empirical observation. We do not have direct access to anyone else's mental processes, and another person's awareness of a fact or set of circumstances is inferable only from circumstantial evidence. Such an inference need not be infallible or indisputable to be reasonable. The prosecutor's cross-examination of Preston was—even without follow-up substantiation—within the range of reasonableness. It was only natural to raise the question of what change of circumstances had brought about the change in Preston's story. Years earlier, she told the police that defendant was the user of methamphetamine, whereas now, at trial, she testified that the methamphetamine and pipe were solely hers. It seems to us understandable and defensible for the prosecutor to attribute Preston's about-face to the expiration of the statute of

limitations—even though, by the very nature of the undertaking, it is impossible to make that causal connection with 100% certainty. "How convenient" seems apt, a fair comment. Maybe Preston told the truth when professing ignorance of the statute of limitations. However, she already was in jail for unlawful possession of methamphetamine, and it would have been foolhardy for her to state, under oath, that the methamphetamine found in defendant's residence was hers unless she had first assessed her legal exposure from such a confession. Surely, the prosecutor had cause to be skeptical of her supposed disregard of the risk. A criminal statute, including a statute of limitations, is public information that is widely accessible (as criminal statutes must be to serve their purpose). Because criminal statutes are expected to be publicly viewed, Preston's knowing exploitation of the expired statute of limitations was reasonably inferable from the circumstances, without substantiation—or so it could be argued.

¶ 41 The rejoinder might be made that court records likewise are expected to be publicly viewed and that, generally, the scheduling of a hearing in a paternity case is noted in the court records. From the opinion in *Williams*, though, we do not know what the court records in the paternity case said.

¶ 42 In sum, as the State argues, "any permissible matter which affects the witness's credibility may be developed on cross-examination" (internal quotation marks omitted) (*People v. Stevens*, 2014 IL 116300, ¶ 16), and the expiration of the statute of limitations arguably had relevance to Preston's credibility. The impeachment of Preston, under the circumstances of this case, does not have the odor of sharp dealing or dishonesty that emanates from cases of unfair impeachment by insinuation. We find no error of the type condemned in *Preston* and *Williams*— and, alternatively, if there was such an error, the error is far from clear or obvious. See *Sebby*, 2017 IL 119445, ¶ 48. Therefore, the doctrine of plain error does not avert the procedural

forfeiture of the impeachment issue, and we give effect to the forfeiture. See *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009).

¶ 43                                B. The Claim of Ineffective Assistance

¶ 44          Defendant claims that defense counsel rendered ineffective assistance by failing to object to (1) the lack of substantiation that Preston knew of the expired statute of limitations and (2) evidence of uncharged bad conduct, namely, defendant's possession of the pills.

¶ 45          "[D]ecisions regarding what matters to object to and when to object are matters of trial strategy." (Internal quotation marks omitted.) *People v. Perry*, 224 Ill. 2d 312, 344 (2007). The supreme court has held that "[e]rrors in trial strategy do not constitute ineffective assistance unless counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *People v. Custer*, 2019 IL 123339, ¶ 39. It would be an exaggeration to claim that, in this case, defense counsel entirely failed to conduct any meaningful adversarial testing. Calling Preston and eliciting testimony from her that the methamphetamine and pipe belonged to her rather than to defendant subjected the State's case to meaningful adversarial testing. The State's impeachment of Preston did not make her testimony meaningless or clearly unworthy of serious consideration. The jury had a choice of believing her or disbelieving her when she testified she was unaware of the statute of limitations—and the jury might well have believed her in that respect but disbelieved her that the methamphetamine belonged to her. Because there was meaningful adversarial testing, defendant's disagreements with defense counsel's trial strategy cannot support a claim of ineffective assistance. See *People v. Segoviano*, 189 Ill. 2d 228, 248 (2000).

¶ 46                                III. CONCLUSION

¶ 47          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 48        Affirmed.